# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued December 5, 2013        Decided May 27, 2014

No. 12-7115

EMMETTE MCCORMICK, JR.,
APPELLANT

v.

DISTRICT OF COLUMBIA, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:07-cv-00570)

*Robert C. Seldon* argued the cause for appellant. With him on the briefs was *Lauren E. Marsh*.

*Holly M. Johnson*, Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellees. With her on the brief were *Irvin B. Nathan*, Attorney General, *Todd S. Kim*, Solicitor General, and *Donna M. Murasky*, Deputy Solicitor General at the time the brief was filed.

Before: BROWN, *Circuit Judge*, and WILLIAMS and SENTELLE, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge*
SENTELLE.

SENTELLE, *Senior Circuit Judge*: Emmette McCormick, Jr.,
a discharged supervisory employee of the District of Columbia
Department of Corrections, brought this action against the
District and two of its officials, alleging violations of his rights
under the District's whistleblower statute and of his liberty
interests under the Fifth Amendment. He appeals from the
district court's grant of summary judgment in the defendants'
favor on all counts. Because we agree with the district court that
there is no genuine issue of material fact and that the defendants
are entitled to judgment as a matter of law, we affirm the grant
of summary judgment.

## I. BACKGROUND

### A. Factual History

In 2006, appellant was a Supervisory Correctional Officer
with the District of Columbia Department of Corrections. In
that capacity, he was an at-will employee in the Management
Supervisory Service. On January 13 of that year, approximately
100 inmates were mistakenly released from their cells at the
central detention facility, where McCormick served in his
supervisory capacity. Numerous correctional officers, including
appellant, responded to the situation to get the inmates back into
their cells. McCormick maced at least two inmates after they
did not follow his instructions. During the disturbance, some
inmate on a higher floor threw a bucket of ice water over
McCormick. He did not see which inmate was responsible.
Later evidence identified Michael Tobias as the inmate who had
thrown "a watery liquid substance" at McCormick. After order
was largely restored in the facility, McCormick had Tobias
brought to the sally port, an enclosed entry and security area,

and confronted him there. The parties do not agree on precisely what occurred there.

At the conclusion of the disturbance, each on-duty officer was required to file a "Report of Significant Incident." Such reports, required to be filed following any out-of-the-ordinary event at the detention facility, should include any use of force by a corrections officer on an inmate or physical assault on a corrections officer by an inmate, as well as any injuries to an officer or inmate. None of the reports filed the day of the incident reported McCormick as having struck Tobias.

A few days after the incident, someone representing herself as a member of Tobias's family sent an email to a city council member, alleging that after the ice water incident, McCormick had Tobias escorted to the enclosed sally port and struck him in the face and ear while six other guards held him. The email was forwarded to the Department of Corrections and passed on to Internal Affairs for investigation. Wanda Patten, Chief of Internal Affairs, directed investigator Valerie Beard to conduct the investigation.

As we set forth the results of the investigation, we note that the parties disagree as to the truth of the statements obtained and the accuracy of the investigators' conclusions. However, as is pertinent to the case before the district court on summary judgment, there is no genuine issue of fact as to what the investigation reports, only as to the accuracy of the witness statements obtained by the investigators, which is not a matter for the court's review.

One corrections officer, Jimmy Harper, stated under oath that after the inmates were returned to their cells, McCormick inquired at the control module where Harper was stationed about the inmate who had thrown water on him. Harper then helped

McCormick find Tobias in his cell and Tobias "was escorted to the sally port." Then, when Harper was returning to the control module, he witnessed McCormick slap the handcuffed inmate while saying to him, "You better never throw s*** on me again."

Another corrections officer, David Thomas, stated under oath that he remembered the inmate being taken from his cell in handcuffs to the sally port. He also saw McCormick strike the handcuffed inmate with his open hand.

Corrections officer Kirkland Marion testified that he accompanied McCormick and five other officers to Tobias's cell and that Tobias was taken from the cell in handcuffs to the sally port. Although Marion did not accompany McCormick, the other officers, and Tobias to the sally port, he arrived there sometime after they did. When he was there, he saw and heard McCormick yelling, "Don't ever throw s*** at me again." He did not, however, see McCormick strike Tobias.

Senior correctional officer James McElhaney told Internal Affairs that he saw "McCormick yelling at Tobias" in the sally port and that McCormick was "in Tobias's face and Tobias had on handcuffs." McElhaney witnessed the incident through the glass of a closed door and could not hear what McCormick was saying. However, he discerned from McCormick's gestures that McCormick was yelling. Like Marion, McElhaney did not see McCormick strike Tobias. Two other officers gave accounts of events in the sally port in which they apparently confused Tobias with one of the inmates who had been maced, but neither of them reported seeing McCormick strike anyone. Ten other correctional officers were interviewed and reported they had not witnessed the incident.

Although Tobias initially refused medical care, writing "I feel better," he later asserted that he made that refusal after McCormick had threatened to put him in lockdown. The day after the incident, a doctor examined Tobias and found that his right ear had a small streak of blood about 4mm long, lying across the eardrum, and that he had suffered mild trauma to his right jaw.

Based on the results of the investigation, Valerie Beard, the Internal Affairs investigator, concluded that "McCormick struck inmate Michael Tobias across the right side of his face with an open hand at least once while he was handcuffed in the sally port." She concluded that McCormick had "displayed a blatant disregard for the agency's established guidelines for the use of force" and may have violated "the assault statute of the Criminal Code of the District of Columbia."

Investigator Beard referred her report to her superior Patten, who reviewed the report and Beard's findings. Patten made corrections in form, but submitted the report to Devon Brown, the Director of the Department of Corrections, without substantive change. Director Brown placed McCormick on administrative leave on March 9, 2006, after Patten told him that McCormick had "inappropriately, without just cause struck an inmate under his care."

According to Director Brown, he then wrote to the Deputy Mayor of the District of Columbia, requesting approval to terminate McCormick, as was required for the termination of at-will employees of the District of Columbia Management Supervisory Service, like McCormick. Though no copy of that letter was ever produced, Brown proceeded with the termination, and there is no contention that the Deputy Mayor ever disapproved the termination.

Brown testified that he terminated McCormick because Internal Affairs had concluded that McCormick had assaulted a handcuffed inmate. He testified that he was aware of the evidence from the other corrections officers, both those who did and did not report seeing the incident. He further testified that he was aware that none of the officers had included the assault in their initial reports of the events of January 13 and had issued a directive to the staff that a "code of silence . . . would not be accepted in the department." At no time did Director Brown or the Department of Corrections publish the Internal Affairs report. The report was not placed in McCormick's personnel file. Brown did not provide McCormick's termination letter to anyone outside the Department. He did not disclose the basis of McCormick's termination to anyone other than the Deputy Mayor, and that disclosure was necessary to obtain authorization for the termination. Beyond that, at some point after the investigation was complete, the Internal Affairs report was forwarded to the United States Attorney's Office for any criminal investigation that office might determine to conduct.

### B. The Litigation

On February 21, 2007, McCormick filed the present action in the Superior Court of the District of Columbia against the District of Columbia, Department of Corrections Director Devon Brown, and Chief of Internal Affairs Wanda Patten. He alleged a claim against the District of Columbia for wrongful discharge, in violation of the District of Columbia Whistleblower Protection Act ("WPA"), D.C. Code § 1–615.51 *et seq.* (2006). He further alleged violation by all defendants of his constitutional rights, specifically of his liberty interests under the Fifth Amendment without due process. Thereafter, the District of Columbia removed the action to the district court, where it proceeded to the summary judgment motions and the entry of summary judgment in favor of all defendants now

before this court. *McCormick v. District of Columbia*, 899 F. Supp. 2d 59 (D.D.C. 2012). We review the entry of summary judgment *de novo*, drawing all inferences from the evidence in favor of the nonmovant. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000).

## II. THE WHISTLEBLOWER PROTECTION ACT

The WPA, in pertinent part, provides that "[a] supervisor shall not take . . . a prohibited personnel action or otherwise retaliate against an employee because of the employee's protected disclosure . . . ." D.C. Code § 1–615.53 (2001). The statute defines "protected disclosure" as:

> any disclosure of information, not specifically prohibited by statute, . . . by an employee to a supervisor or a public body that the employee reasonably believes evidences:
>
> (A) Gross mismanagement;
>
> (B) Gross misuse or waste of public resources or funds;
>
> (C) Abuse of authority in connection with the administration of a public program or the execution of a public contract;
>
> (D) A violation of a federal, state, or local law, rule, or regulation, or of a term of a contract between the District government and a District government contractor which is not of a merely technical or minimal nature; or
>
> (E) A substantial and specific danger to the public health and safety.

D.C. Code § 1–615.52(a)(6). McCormick contends that his termination was not in fact because of the events of January 13, 2006, but was instead in retaliation for protected disclosures that he had made almost a year earlier. Specifically, he alleges that in March of 2005, he discovered that Wanda Patten, now a defendant-appellant in this action, had improperly allowed unredacted statements by two correctional officers slated to testify in the prosecution of a violent inmate to fall into the hands of that inmate. The unredacted statements dangerously contained the home addresses of the two witness officers. McCormick reported this impropriety to the Deputy Director of DOC and the Office of Internal Affairs. We agree with the district court that the evidence of record cannot survive summary judgment on this claim.

Retaliation claims under the District of Columbia's Whistleblower Protection Act are subject to analysis under "the burden-shifting framework established by *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Payne v. District of Columbia*, 722 F.3d 345, 353 (D.C. Cir. 2013). Applying that analysis at the stage of summary judgment, we determine first whether the plaintiff has made out "a prima facie case." In order to establish such a case of retaliation, the plaintiff must present "evidence of retaliation sufficient for a reasonable jury to conclude that his protected activity was a contributing factor in the alleged prohibited personnel action." *Id.* (internal quotations and citations omitted). Under the *McDonnell-Douglas* analysis, the presentation of a prima facie case shifts the burden of proof to a defendant employer, but McCormick has not established a prima facie case, and therefore the burden does not shift.

In order to survive a summary judgment motion under the *McDonnell-Douglas* framework as applied to the District of Columbia whistleblower statute, a plaintiff must "challenge the motion for summary judgment with a proffer of admissible

evidence that [his] 'protected activity' . . . was a 'contributing factor'" in his adverse employment actions. *Johnson v. District of Columbia*, 935 A.2d 1113, 1118 (D.C. 2007); *see also O'Donnell v. Barry*, 148 F.3d 1126, 1133 (D.C. Cir. 1998) ("[T]he employee must show that [his] speech was a substantial or motivating factor in promoting the retaliatory or punitive act of which [he] complains."). McCormick has offered no direct evidence that the decision by the Director of the Department of Corrections to terminate him was motivated by his earlier disclosures of the mishandling of confidential identity information.

Of course it is not surprising that there is no direct evidence, and "it is indeed common that causation elements dependent upon the intent of an actor would be proven by circumstantial rather than direct evidence." *Payne*, 722 F.3d at 354. The difficulty for McCormick is he has not provided the necessary circumstantial evidence to fill the gap. All he has really shown on the subject of retaliation is that he made a disclosure in March of 2005 and he suffered adverse employment actions in January of 2006. As we observed in *Payne*, it is true that "temporal proximity" between a protected disclosure and a termination is circumstantial evidence of causation. But as we further observed in *Payne*, "[o]nce the time between a protected disclosure and a negative employment action has stretched to two-thirds of a year there is no temporal proximity." *Id.* (internal quotations omitted). Indeed, in *Johnson*, the District of Columbia Court of Appeals, whose decisions bind us on matters of D.C. law, rejected a "four-month lapse of time as proof of a causal connection between the protected disclosures and the adverse actions." 935 A.2d at 1120.[1]

---

[1]Although McCormick stresses the fact that Beard—who recommended the decision to terminate him—was a subordinate of Patten's, whom he alleges has a motive to retaliate, and thereby emphasizes that Beard might have had

Obviously the ten-month passage of time between the disclosures and the actions exceeds the two-thirds of a year held inadequate in *Payne* and the four months rejected in *Johnson*. Like the courts in those cases, we cannot conclude that the plaintiff has provided evidence of causation sufficient to survive summary judgment or to shift the burden to the defense. McCormick attempts to bridge the gap by reference to events occurring in June of 2005. According to McCormick's proffer, Patten first tried to retaliate for his disclosure by recommending his termination based on a discrepancy between his report and that of another officer in an investigation of crack cocaine in an inmate's cell. Under McCormick's theory, that incident, coupled with the incident currently under litigation which resulted in his termination, evidences an on-going retaliation based on his initial disclosures against Patten.

The difficulties with this theory are numerous. In the first place, we do not know that the June incident was retaliatory. There is no temporal proximity to the present alleged events. The gap between the June incident and the January one is longer than the interval rejected as circumstantial evidence in *Johnson* and equals the interval rejected by us in *Payne*. Further, there is no evidence to connect the actions against McCormick in June of 2005 with those in the present case. In addition to the lack of circumstantial or other evidence of retaliatory causation, McCormick also faces the inescapable fact that Patten, the only official against whom he had made a disclosure and who might therefore be suspected of retaliation, did not make the decision to take the adverse employment action. According to the evidence before the district court and before us, Valerie Beard

knowledge of his prior disclosures, these bits of evidence do not contribute to the establishment of a prima facie case. Presumably in every case where an employee alleges retaliation, the action claimed to be retaliatory will be in the same employment organization as the blown whistle. Without some evidence of retaliatory intent, the prima facie case is not made.

was the initial recommender of termination, and Director Brown made the decision to effect that employment action.

We note that the district court did not decide whether McCormick had made out a prima facie case but assumed for purposes of the motion that he had and proceeded to the next steps of the *McDonnell-Douglas* analysis. We recall, however, that we review the decision of the district court on summary judgment *de novo* and may affirm on a different theory than that relied upon by the district court. *See, e.g.*, *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1036 (D.C. Cir. 2003); *see also 3883 Connecticut LLC v. District of Columbia*, 336 F.3d 1068, 1069 (D.C. Cir. 2003). However, we observe that the district court's reasoning concerning the further steps of the *McDonnell-Douglas* analysis is sound. Even if McCormick had made out a prima facie case of retaliatory motive, the question would still remain as to whether that animus was in fact the cause of his discharge, or whether for independent lawful reasons the employer would have taken the same action without respect to retaliatory motive. As the district court observed, the only evidence on this point is that the Department "terminated Plaintiff because Internal Affairs found that he struck a restrained inmate." *McCormick*, 899 F. Supp. 2d at 70. And as the district court further observed, McCormick offered no evidence in rebuttal.

As the district court acknowledged, and as we observed above, the parties differ as to the veracity of the witnesses against McCormick, "but whether Plaintiff struck a restrained inmate is a wholly different factual question from whether the Department of Corrections terminated Plaintiff because its investigation found that he had." *Id.* It is not our duty to sit as a super board of employment, reviewing the decision of the employer on the underlying facts. The investigation disclosed a dischargable event. We do not have the authority, nor did the

district court, to conduct a trial of the events investigated in the Internal Affairs investigation. The relevant fact is that the investigation revealed serious misconduct by McCormick. The evidence further reveals that based on that investigation, the Director terminated McCormick. The witnesses against McCormick may have been wrong. They may have all been right, or some right and some wrong. The fact remains, the evidence is that the employer terminated McCormick not for the events of March 2005, but those of January 2006. We affirm the grant of summary judgment on the claims under the Whistleblower Act.

## III.  THE CONSTITUTIONAL CLAIM

In addition to his claim under the WPA, McCormick asserts a constitutional claim against the District, Brown, and Patten. He argues that his "for cause" termination deprived him of a constitutionally protected interest in the pursuit of a further career in the field of corrections. According to McCormick, when he applies in the future for corrections positions with the federal government or with states or municipalities, he will be subject to a background investigation, requiring him to disclose that he was terminated for cause for assaulting a restrained inmate. He further offers evidence of record that he has applied for and been rejected from numerous positions in federal law enforcement and as a security guard. He argues, therefore, that the for-cause termination has precluded and will continue to preclude him "from pursuing" a career in his "chosen" field of corrections. Appellant's Br. at 38 (citing *O'Donnell*, 148 F.3d at 1141). McCormick argues, therefore, that this is a deprivation of his liberty interests and that due process requires that he be afforded a pre-termination hearing or other adequate process for the protection of his right.

The district court agreed with McCormick that the first threshold for a due process claim had been crossed. That is, it agreed that McCormick had been deprived of a protected liberty interest, but held that District of Columbia law afforded adequate process for that deprivation. More specifically, the district court held that the District of Columbia Comprehensive Merit Personnel Act, D.C. Code § 1–601.01 *et seq.* (2006), provided post-termination hearings that afforded the process necessary to the protection of the employees' constitutional rights. On appeal, the District of Columbia concedes that the Personnel Act does not provide post-termination hearings for at-will employees in the Management Supervisory Service such as McCormick. However, although the district court erred in its reason for granting summary judgment in favor of the District, as we noted above, we review the decision of the district court on summary judgment *de novo* and may affirm on a different theory than that relied upon by the district court.

To sustain a procedural due process claim, a plaintiff must first demonstrate the existence of a protected liberty or property interest. *See Board of Regents v. Roth*, 408 U.S. 564, 569–70 (1972). At first reading, the record does not support a conclusion that the District of Columbia deprived appellant of a legally protected interest. As we noted in *Kassem v. Wash. Hosp. Ctr.*, 513 F.3d 251(D.C. Cir. 2007), "'It has long been settled in the District of Columbia that an employer may discharge an at-will employee at any time and for any reason, or for no reason at all.'" *Id.* at 254 (quoting *Adams v. George W. Cochran & Co.*, 597 A.2d 28, 30 (D.C. 1991) (collecting authorities)). Normally, one cannot be deprived unlawfully of something to which one had no legally protected right before the deprivation. The parties, however, agree that there are two theories, drawn from *Roth*, that provide limited circumstances under which an at-will employee may establish a due process claim arising out of his termination.

It is true that in *O'Donnell* we recognized the possibility of an action for deprivation of a liberty interest without due process where an employee is terminated. But the availability of such an action in the case of an at-will employee is at best very narrow. The first of two theories to which *Roth* and *O'Donnell* refer, supporting the availability of such an action, is a "reputation-plus claim," *see O'Donnell*, 148 F.3d at 1140. This theory makes the termination actionable only where the terminating employer has disseminated the reasons for the termination and such dissemination is defamatory. *See Orange v. District of Columbia*, 59 F.3d 1267, 1274 (D.C. Cir. 1995). The second theory, which is not always distinct from the first, provides a remedy where the terminating employer imposes upon the discharged employee "'a stigma or other disability that foreclosed [the plaintiff's] freedom to take advantage of other employment opportunities.'" *O'Donnell*, 148 F.3d at 1140 (quoting *Roth*, 408 U.S. at 573). According to our dicta in *O'Donnell*, the difference between the two theories of recovery is that the "stigma" claim, unlike the reputation-plus claim, "does not depend on official speech" but on a "stigma or disability arising from official action." *Id.*

It is not totally clear from McCormick's pleadings in the district court or his initial brief before us which of the two theories he is relying upon, though in his reply brief in this court he expressly disavows the reputation-plus theory in favor of the stigma approach. In either event, appellant has not established that the district court erred in its judgment, although we affirm on different reasoning. Appellant's factual theory is that the appellees took the official act of firing him. He cannot obtain other employment in his chosen field, therefore he has suffered stigma. The stigma arises from his having to tell prospective employers why he was fired. But the only official act committed by the defendants is the termination. The termination of an at-will employee is not sufficient to establish the

deprivation of protected liberty interests.

The Supreme Court in *Bishop v. Wood*, 426 U.S. 341 (1975), effectively disposes of McCormick's claims. In *Bishop*, the Court recognized that the *Roth* Court had stated "that the nonretention of an untenured [employee] might make him somewhat less attractive to other employers." *Id.* at 348. Nonetheless, the *Roth* Court had "concluded that it would stretch the concept too far 'to suggest that a person is deprived of 'liberty' when he simply is not rehired in one job but remains as free as before to seek another.'" *Bishop*, 426 U.S. at 348 (quoting *Roth*, 408 U.S. at 575). The *Bishop* Court went on to hold that the "same conclusion applies to the discharge of a public employee whose position is terminable at the will of the employer when there is no public disclosure of the reasons for the discharge." *Id.* Unfortunately for McCormick, that language precisely describes his case.

Were we to hold that the termination of an at-will employee without hearing is a deprivation of due process, we would effectively eliminate from the law the well-recognized status of at-will employee. As the Supreme Court summed up the proposition in *Bishop*:

> The federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies. We must accept the harsh fact that numerous individual mistakes are inevitable in the day-to-day administration of our affairs. The United States Constitution cannot feasibly be construed to require federal judicial review for every such error. . . . The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions.

426 U.S. at 349–50. McCormick asks us to provide the forum which the Supreme Court largely foreclosed in *Bishop*. Under established law we cannot feasibly examine the conclusions of the investigator or the Director of the Department of Corrections. Based on the results of that investigation, which the Director accepted, McCormick was guilty of serious misconduct, and he was terminated. Any error in the decision to terminate first appears to be one of the numerous and inevitable mistakes recognized in *Bishop*.

McCormick, however, in reliance on the stigma theory, asserts that his liberty interest in further employment in his chosen profession supports a claim for deprivation of liberty without due process. This, he asserts, is actionable even though he was an at-will employee and there was no government publication of derogatory information about him. In support of his theory, he points to *O'Donnell*, *supra*, wherein this court, in rejecting the stigma theory on the facts before it, discussed—not communication by the government—but the plaintiff's remaining reasonable job opportunities in the field. *Id.*, 148 F.3d at 1140–41. Similarly, in *Taylor v. Resolution Trust Corp.*, where the government did make public statements, we focused on the plaintiff's future employment prospects without reliance on the government's publications. 56 F.3d 1497, 1506–07 (D.C. Cir. 1995). *Bishop v. Wood*, *supra*, does not address this understanding.

Therefore, *Bishop* does not dispose of this theory. The plaintiff in *Bishop* advanced a pair of reasons why his termination violated his liberty interest: (1) because the "reasons given for his discharge are so serious as to constitute a stigma that may severely damage his reputation in the community" and (2) that the reasons given were false. *Bishop*, 426 U.S. at 347. The Court rejected the first claim on the grounds that the reasons for termination had not been made public and therefore could

not affect Bishop's "'good name, reputation, honor, or integrity.'" *Id.* at 348 (quoting *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971)). Although the Court referred to the "stigma" created by the dismissal, it used that term to refer to the effect on his reputation, not on his future employment prospects. *Id.* at 347. And *Bishop* repeated the assumption in *Roth* that the individual was "as free as before to seek another" job. *Id.* at 348. If the plaintiff's allegations did not contradict that assumption, plainly he had not made out a case that he was broadly precluded from his chosen profession.

McCormick, in contrast, cites deposition testimony to the effect that he can never again be employed in the corrections field and that therefore, his termination implicates his liberty interest. Appellant's Reply Br. at 12 (citing J.A. 428–29; 500–03 (testimony of former Acting Warden Corbett and Director Brown)). Although that testimony is not as compelling as McCormick suggests, it is arguably sufficient to establish a "genuine dispute as to [a] material fact," Fed. R. Civ. P. 56(a)—namely whether the circumstances of the termination had the broad effect of barring him from further employment in his chosen profession.

Nonetheless, we affirm the judgment of the district court because any deprivation of liberty by stigmatizing was not without due process. In this case due process requires only that McCormick have "an opportunity to clear his name." *Codd v. Velger*, 429 U.S. 624, 627 (1977). The basic requirement in such a hearing is minimal: it must provide notice of the charges and an opportunity to refute them effectively. *Id.*; *Doe v. DOJ*, 753 F.2d 1092, 1112 (D.C. Cir. 1985). The Second Circuit, for example, has found adequate an administrative process that provides "the means necessary to clear [the plaintiff's] name, including the opportunity to present evidence, call witnesses, cross-examine witnesses, and make an oral presentation through

union-selected counsel." *Segal v. City of N.Y.*, 459 F.3d 207, 216 (2d Cir. 2006). Other courts have described the procedural requirements as having "substantial flexibility," but certainly being met where "the claimant ha[d] notice of the charges which have been raised against him, and an opportunity to refute, by cross-examination or independent evidence, the allegations which gave rise to the reputational injury." *Campbell v. Pierce Cnty., Ga.*, 741 F.2d 1342, 1345 (11th Cir. 1984). And the Eighth Circuit found adequate a hearing where a dismissed school supervisor was given unlimited time to speak before the school board and have his attorney speak on his behalf. *Hammer v. City of Osage Beach*, 318 F.3d 832, 836, 840-41 (8th Cir. 2003).

Although the District acknowledges that its argument before the district court erred as to the *forum* in which McCormick could have sought relief, Appellee's Br. at 39, it seems correct in arguing before us that McCormick could have pursued an action for review, including one for severance, in Superior Court (or in the district court once the case was removed). D.C. Code §§ 1-606.03; 1-609.54(b). Such an action would meet the requirements of a name-clearing hearing. Indeed, McCormick does not deny that this procedure would have provided an adequate hearing, instead protesting that he could not have brought a suit for severance because he was in the Management Supervisory Service, Appellant's Reply Br. at 16. That assertion seems flatly contradicted by D.C. Code § 1-609.54, which provides a severance schedule for members of the Management Supervisory Service.

In short, even assuming that McCormick has provided sufficient evidence of a deprivation of his liberty interest, such deprivation was not without due process, and we agree with the district court that the appellees were entitled to summary judgment.

**CONCLUSION**

We have considered the other issues discussed by the parties and conclude that none of them warrant separate discussion. For the reasons set forth above, the judgment of the district court is

*Affirmed.*