# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 25, 2013        Decided June 27, 2014

No. 12-7090

STEPHEN IFEANYI AMOBI AND NGOZI AMOBI,
APPELLANTS

v.

DISTRICT OF COLUMBIA DEPARTMENT OF CORRECTIONS, ET
AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:08-cv-01501)

*J. Michael Hannon Jr.* argued the cause and filed the briefs for appellants.

*Richard S. Love*, Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellees. With him on the brief were *Irvin B. Nathan*, Attorney General, *Todd S. Kim*, Solicitor General, and *Donna M. Murasky*, Deputy Solicitor General at the time the brief was filed. *Loren L. AliKhan*, Deputy Solicitor General and *Mary L. Wilson*, Assistant Attorney General, entered appearances.

Before: TATEL and BROWN, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*:  The facts giving rise to this case are as curious as they are disturbing.  Eight years ago, Derrick Brown ("Brown" or "the Inmate"), a conniving prisoner serving a series of weekend sentences at the District of Columbia Jail, assaulted Correctional Officer ("CO") Stephen Amobi.  Despite the fact that Amobi was the victim of an unprovoked attack whose injuries required medical attention, Amobi was arrested, criminally prosecuted, and fired from his employment.  Even after being acquitted at his subsequent criminal trial, after Brown admitted to initiating the confrontation and assaulting the officer, and after prevailing in a contested administrative hearing, Amobi was not reinstated until a D.C. Superior Court judge intervened.

Amobi and his wife sued the District of Columbia, the D.C. Department of Corrections ("DOC"), and several Jail officials, seeking relief under federal law and D.C. common law for conspiracy, false arrest, malicious prosecution, defamation, intentional infliction of emotional distress ("IIED"), deprivation of due process, aiding and abetting, and loss of consortium.  The Defendants moved for summary judgment and, in a perfunctory nine-page opinion, the district court granted the motion.  On appeal, Amobi challenges the district court's judgment in favor of the Defendants.  Concluding that genuine issues of material fact exist regarding the false arrest, malicious prosecution, and IIED claims, we affirm in part, reverse in part, and remand to the district court for further proceedings.

3

I

A

The puzzling details of this dispute begin on the morning of June 4, 2006, when the Jail was locked down because of the escape of two extremely dangerous inmates the day before. Brown, who is transgendered, was serving the third of fifteen weekends for simple assault and was scheduled for release at noon. The lockdown slowed the release process and Brown became increasingly agitated as he waited to be released from his cell. When Amobi arrived, Brown was argumentative and abusive. By the time Amobi and Brown arrived at the sally port, the verbal altercation had escalated into a nose-to-nose shouting match. Amobi attempted to retreat into the "Bubble," a round glass enclosure separating the sally port from the inmate housing units, but Brown obstructed his path.

As Brown later testified, when he saw the officials approaching the sally port, he wanted to lure Amobi into attacking him so he could file a civil suit and "get some money." Brown was in a position to see, and be seen by, someone in the adjacent hallway. Warden Robert Clay, Deputy Warden Stanley Waldren, and Major Elbert White were conducting a fire and safety inspection. As the officials approached the sally port, Brown took advantage of their restricted line of sight and punched Amobi on his right forearm. Amobi reacted immediately by restraining Brown and forcing him against the wall. The officials, who saw Amobi's reaction, but not the assault that precipitated it, sprinted to the sally port, ordered Amobi to release Brown, and turned a deaf ear to Amobi's attempt to explain he had acted in self-defense. White ordered Amobi not to speak until instructed to do so.

4

After receiving medical attention, Amobi was taken to the Command Center where his injuries were photographed. When he proceeded to Waldren's office, as instructed, he found the three officials who had stopped the altercation, the Director of the Office of Internal Affairs (Wanda Patten) and an OIA investigator (Valerie Beard). Amobi was ordered placed on administrative leave, and he and the witnesses, including the witnesses who had actually seen what happened or heard Brown boast that he had just set up a lawsuit, completed incident reports.

The initial investigation ignored this exculpatory evidence and focused instead on an alleged interview with Brown in which Patten and Beard claimed Brown wanted to press criminal charges. While Amobi was preparing his incident report, the police were summoned. The responding police officer, Albert Henley, was shown the incriminating incident reports of Clay, Waldren, and White, but none of the exculpatory reports. Officer Henley was also told that the Inmate had made a corroborating statement witnessed by Patten and Beard. As a result, Amobi was arrested, charged with simple assault, and released.

B

On July 12, 2006, Amobi was summarily removed from his position. The basis for Amobi's dismissal included the interview with Inmate Brown which, as subsequent events revealed, was fictional. Amobi promptly challenged the Department's actions and, after a hearing on August 3, 2006, the hearing officer determined Amobi had acted in self-defense and recommended reinstatement. DOC's Director, Devon Brown, disagreed, and Phuoc Nguyen, the hearing officer, under pressure from the administration, reconsidered and recommended termination. Amobi appealed, but for reasons

5

never explained in the record, the appeal was never resolved. Consequently, Amobi demanded arbitration in accordance with his union's collective bargaining agreement ("CBA").

C

The criminal prosecution, which had stalled in August 2006 when the District was unable to produce the photos of Amobi's injuries, *see United States v. Amobi*, 2006 CMD 012120 (D.C. Super. Ct. Aug. 15, 2006), was reopened in October 2006, after the U.S. Attorney's Office was, according to Amobi, pressured to refile the charges. The government's case fell apart when Brown took the stand, however, and for the first time, provided a damning, self-inculpatory account of the artifice he employed during the June 2006 assault. Brown admitted he wanted to "set Mr. Amobi up so someone could witness [Amobi] do something to [him]." S.A. 297. [1] Brown confessed he knew the three Jail officials were "important people"[2] and that, in wake of the inmate escape, the officials "were very suspicious about things that were going on in the jail." *Id.* at 296–97. Exultant over having secured the Jail officials as witnesses to his ruse, Brown boasted to CO Wayne Taylor of his exploits, which CO Stephen Harris overheard and documented in his incident report. And true to his word, Brown made good on his plan to file a civil suit. *See*

---

[1]    "S.A." and "P.A." refer to Appellants' Supplemental Appendix and Public Appendix, respectively.

[2]    Brown's numerous run-ins with the law provided ample opportunity to become well acquainted with DOC officials. Brown testified he had a criminal history of simple assault, fleeing law enforcement, four counts of destruction of property, sexual solicitation, and contempt of court. P.A. 12; S.A. 275–76. Brown also testified he attempted to smuggle marijuana into the Jail the weekend before the June 2006 assault. S.A. 290–91.

*Brown v. D.C. Dep't of Corrections*, 2006 SC3 014278 (D.C. Super. Ct. Dec. 22, 2006). Brown explained his motivation for the stunt was a desire to get even with those who ridiculed him for being transgendered "when [he] was coming to do [his] sentence." S.A. 305–06. Ultimately, Brown owned up to "turn[ing] the altercation from verbal to physical . . . [so] that [he] would get a response from Mr. Amobi[,] . . . get . . . money[,] . . . and . . . get . . . witnesses." S.A. 312. Following Brown's bombshell testimony, the trial judge found Amobi not guilty—the verdict coming exactly one year to the day of the June 4, 2006 altercation.

D

Although Amobi had requested the arbitration, to which he was entitled under his CBA, he requested that, in light of his exoneration, he be allowed to return to work immediately. The District's attorney, Repunzelle Johnson, also counseled against proceeding with the scheduled arbitration and instead advised Director Brown to return Amobi to work. In an October 1, 2007 memo to Director Brown, Johnson laid bare the numerous discrepancies in the District's case. First, Johnson recounted how each of the three Jail officials acknowledged they did not see what happened prior to the alleged assault. Second, Johnson highlighted the fact that DOC "did not do an independent investigation to determine what happened prior to the assault of Inmate Brown." S.A. 398. Third, and perhaps most seriously, Johnson cautioned that although the police had relied on DOC's eyewitness statements, Patten and Beard's supposed interview of Brown was pure fiction, and Amobi's incident report was never given to the police. Fourth, Johnson reminded Director Brown of the Inmate's incriminating testimony and that CO Ernest Wallace also corroborated Amobi's account. Fifth, Johnson informed Director Brown that, in addition to Amobi's visit

with Dr. Boakai, the District had "independent medical documentation from a private physician which supports that Amobi had a bruise on his right arm."[3] *Id.* Sixth, Johnson lamented DOC's inability to locate the three photographs taken of Amobi's injuries. Finally, Johnson admonished the Director for failing to consider all the *Douglas* Factors, which, on balance, suggested "termination is probably not warranted."[4] S.A. 399.

Despite Amobi's request and Johnson's appeal to reason, Director Brown proceeded with the arbitration hearing and refused to reinstate Amobi. Hearings were held on October 2 and 3, 2007. A little less than three months later, the arbitrator concluded Amobi had applied appropriate self-defense

---

[3] In fact, based on medical reports, the D.C. Office of Risk Management, Disability Compensation Program determined that Amobi was eligible for disability compensation as a result of the contusion he suffered on his right arm. *See* P.A. 14, 158.

[4] *See Douglas v. Veterans Admin.*, 5 MSPB 313, 332 (1981). In *Douglas*, the United States Merit Systems Protection Board announced twelve factors relevant to determination of an appropriate penalty for a government employee's job-related misconduct, including: the nature and seriousness of the offense; the employee's job level, past work record, and past disciplinary record; likely effect of the offense on the employee's ability to perform at a satisfactory level; consistency of proposed penalty with those imposed for similar offenses and with an applicable agency table of penalties; notoriety of the offense; impact on agency reputation; clarity of the rules violated; potential for employee rehabilitation; mitigating circumstances; and adequacy of alternative sanctions. *See also Stokes v. District of Columbia*, 502 A.2d 1006, 1011 (D.C. 1985) (noting that an agency must "conscientiously consider the relevant [*Douglas*] factors and . . . strike a responsible balance within tolerable limits of reasonableness").

techniques and that his summary dismissal was without cause. The arbitrator further ordered that Amobi be reinstated with full backpay and benefits and that DOC correct, remove, or destroy all records related to Amobi's summary removal.

Seeking further redress, Amobi and his wife filed suit against the District, DOC,[5] and several Jail officials on June 4, 2008. On August 9, 2012, the district court granted the Defendants' motion for summary judgment, and Amobi and his wife timely appealed on September 10, 2012.

## II

We review de novo a district court's grant of summary judgment, viewing all evidence in the light most favorable to the non-moving party. *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013). The district court focused on the following claims: common law and constitutional false arrest; common law malicious prosecution; common law and constitutional defamation; deprivation of procedural due process; and IIED.[6] We address each in turn.

---

[5] DOC is a *non sui juris* subordinate government agency, D.C. Code § 24-211.01; *Simmons v. District of Columbia Armory Bd.*, 656 A.2d 1155, 1156 (D.C. 1995), and has since been dismissed from this suit.

[6] Holding that Amobi had no other viable claim against any of the defendants, the district court summarily dismissed Amobi's aiding and abetting and loss of consortium claims. *Amobi v. District of Columbia Gov't*, 882 F. Supp. 2d 78, 84 (D.D.C. 2012). Perhaps employing a similar rationale, the district court did not address Amobi's conspiracy claims. *See id.* at 82 n.6. Because we conclude genuine issues of material fact exist as to the false arrest, malicious prosecution, and IIED claims, on remand the district court must reckon with these previously unanalyzed counts.

9

A

1

Amobi claims the district court erred in concluding there was probable cause to effectuate his arrest. We are unable to decide the merits of the common law claim, however, because it is barred by a one-year statute of limitations. *See* D.C. Code § 12-301(4). Amobi filed his complaint on June 4, 2008, two years after his arrest. Although the district court did not decide the claim was time-barred, Appellees raised the timeliness of the common law claim in their motion for summary judgment below. *See* P.A. 94. Appellees may therefore reassert the argument now. *Warren v. District of Columbia*, 353 F.3d 36, 38 (D.C. Cir. 2004) ("[A] prevailing party may defend the judgment on any ground decided or raised below.").

Amobi's rejoinder is unavailing. He claims Appellees' fraudulent concealment of exculpatory evidence tolls the statute of limitations. This argument fails. To establish a claim of fraudulent concealment, Amobi must demonstrate that the information fraudulently concealed was material to the delay. *Fitzgerald v. Seamans*, 384 F. Supp. 688, 693 (D.D.C. 1974). "If plaintiff's delay in bringing the lawsuit is to be excused, the Court must have reason to believe that the 'timely assertion' of plaintiff's rights 'has been postponed as a result of the fraud of the party against whom liability might otherwise have been urged.'" *Id.* (quoting *Searl v. Earll*, 221 F.2d 24, 26 (D.C. Cir. 1954)).

Our cases require that the information concealed be "so material in character that knowledge of a basis for, or intelligent prosecution of, the cause of action was precluded." *Emmett v. E. Dispensary & Cas. Hosp.*, 396 F.2d 931, 937

(D.C. Cir. 1967).  Said differently, the fraudulent concealment must actually succeed in precluding the plaintiff from acquiring knowledge of the material facts.  *See Westinghouse Elec. Corp. v. City of Burlington*, 351 F.2d 762, 764 (D.C. Cir. 1965).  Where "the plaintiff knew, or by the exercise of due diligence could have known, that he may have had a cause of action," the claim that defendants' fraudulent concealment of the facts tolls the statute of limitations must fail.  *Id.*

Here, Amobi contends "[t]he concealment of the lack of an investigation by the Office of Internal Affairs, and the cover-up of the fact that no interview with the inmate ever took place following the incident caused the statute to be tolled until this information was revealed."  Appellants' Reply Br. at 3. But Amobi's eventual claim for false arrest was not predicated on the fraudulently concealed evidence.  *See* P.A. 36, ¶ 38 (noting as the basis for his false arrest claim his arrest by the police "without probable cause and without the issuance of a warrant as required under District of Columbia law").  Indeed, Amobi concedes, perhaps unwittingly so, that "[t]he evidence of fraudulent concealment was not revealed to [him] until *after* the initiation of his lawsuit."  Appellants' Reply Br. at 3 (emphasis added).  Thus, if Amobi knew he had—and in fact initiated—a cause of action for false arrest, Appellees did not succeed in precluding him from acquiring knowledge of the material facts necessary to initiate the claim.  While knowledge of the alleged fraudulent concealment would have no doubt buttressed a claim of false arrest, "[m]ere ignorance of evidentiary details, although such information might be useful at trial, will not suffice," *Fitzgerald*, 384 F. Supp. at 693 (citing *Moviecolor Ltd. v. Eastman Kodak Co.*, 288 F.2d 80, 87 (2d Cir. 1961)).

2

Amobi's constitutional false arrest claim presents a tougher question. Constitutional and common law claims of false arrest are generally analyzed as though they comprise a single cause of action. *See, e.g.*, *Scott v. District of Columbia*, 101 F.3d 748, 753–54 (D.C. Cir. 1996); *District of Columbia v. Minor*, 740 A.2d 523, 529 (D.C. 1999) (noting that, if the court finds a viable common law claim of false arrest, then a viable constitutional claim naturally flows, and vice versa). The elements of both claims are "substantially identical." *Scott*, 101 F.3d at 753. Amobi seeks compensatory and punitive damages under 42 U.S.C. § 1983 for violations of his Fourth Amendment right to be free from unreasonable seizure. Specifically, Amobi claims that, in contravention of D.C. Code § 23-581(a)(1),[7] he was arrested without probable cause for an alleged assault that did not occur in Officer Henley's presence. Appellees agree that, construed as a Fourth Amendment claim for false arrest, Amobi is safely within the prescribed three-year statute of limitations. *See* Appellees' Br. at 33 (citing *Carney v. Am. Univ.*, 151 F.3d 1090, 1096 (D.C. Cir. 1998)). Yet, because Amobi did not name Officer Henley as a defendant in his complaint, *see* P.A. 25–26, he must show either that the "custom or policy of the [District] caused the violation," *Brown v. District of Columbia*, 514 F.3d 1279, 1283 (D.C. Cir. 2008), or that one of the individually named

---

[7] Section 23-581(a)(1) provides that an officer may only make a warrantless arrest for a misdemeanor committed outside his presence if there is probable cause *and* reason to believe that unless immediately arrested, the individual "may not be apprehended, may cause injury to others, or may tamper with, dispose of, or destroy evidence." *See also Enders v. District of Columbia*, 4 A.3d 457, 466 (D.C. 2010).

defendants[8] is to blame, *see Jones v. Horne*, 634 F.3d 588, 600 (D.C. Cir. 2011).

As to the District, Amobi seems to argue that it violated his Fourth Amendment rights based on its alleged custom and policy of failing to comply with its statutory prohibition on warrantless arrests for misdemeanors committed outside of an officer's presence. Amobi is mistaken. Whether the assault occurred in Officer Henley's presence is not the *sine qua non* of a Fourth Amendment violation. The Supreme Court has made clear that the "Constitution's protections concerning search and seizure" do not vary with state arrest law, *see Virginia v. Moore*, 553 U.S. 164, 172–73 (2008), and Amobi makes no argument that the Constitution requires the District's misdemeanor arrest rule. Nevertheless, whether Officer Henley could have had probable cause to execute Amobi's arrest—even without the crime occurring in his presence—is still a relevant inquiry.

"Generally, probable cause exists where the facts and circumstances within the arresting officer's knowledge, of which he had reasonably trustworthy information, are sufficient in themselves to warrant a reasonable belief that an offense has been or is being committed." *Rucker v. United States*, 455 A.2d 889, 891 (D.C. 1983). "The issue of probable cause in a false arrest case is a mixed question of law and fact that the trial court should ordinarily leave to the jury." *Bradshaw v. District of Columbia*, 43 A.3d 318, 324 (D.C. 2012). Only where the facts are undisputed or clearly established does probable cause become a question of law for the court. *Id.* The district court held Amobi's claim for false

---

[8] The individually named defendants include Devon Brown, Robert Clay, Stanley Waldren, Elbert White, Joan Murphy, and Denise "Toni" Shell. *See* P.A. 25–26, 32.

arrest failed because the Jail officials "merely reported what they observed, and their observations constituted probable cause" for Amobi's arrest and prosecution. *Amobi*, 882 F. Supp. 2d at 83. Amobi counters with two arguments he claims demonstrate want of probable cause.

First, Amobi contends his claim of innocence created a genuine issue of material fact that should have been sent to the jury. *See* Appellants' Reply Br. at 6–7 (citing *Wolter v. Safeway Stores*, 153 F.2d 641, 642 (D.C. Cir. 1946)). This argument fails. "Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997); *Panetta v. Crowley,* 460 F.3d 388, 395–96 (2d Cir. 2006) ("[A]n officer's failure to investigate an arrestee's protestations of innocence generally does not vitiate probable cause.").

Here, Officer Henley testified that he based his probable cause finding on statements from five witnesses. Although Amobi contends the five witnesses provided inaccurate information, the officer had no reason to discredit the eyewitness testimony. *See Enders*, 4 A.3d at 470–71 ("[T]he relevant inquiry in a false arrest defense is not what the actual facts may be but rather what the officers could reasonably conclude from what they were told and what they saw on the scene."). Thus, Amobi's statement that Brown struck him first does not by itself vitiate probable cause. In sum, because violation of § 23-581 did not result in constitutional injury, and because Amobi failed to identify any other municipal policy, practice, or custom that was a moving cause of his claimed constitutional violation, his constitutional false arrest claim against the District was properly dismissed.

Amobi's second argument is more nettlesome, but persuasive. He asserts that, although the three Jail officials did not carry out his arrest, they are nevertheless personally liable for his false arrest because they withheld exculpatory evidence from the arresting officer. "[T]o establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right. . . . [T]he plaintiff in a personal-capacity suit need not establish a connection to governmental policy or custom . . . ." *Hafer v. Melo*, 502 U.S. 21, 25 (1991).

Under D.C. law, "[l]iability is incurred for the procuring of a false arrest and imprisonment if by words, one directs, requests, invites or encourages the unlawful detention of another." *Smith v. District of Columbia*, 399 A.2d 213, 218 (D.C. 1979). "[P]rocurement of false imprisonment is the equivalent in words or conduct to 'Officer, arrest that man.'" *Id.* (quoting RESTATEMENT (SECOND) OF TORTS, § 45A). Accordingly, "[t]o accuse a person of committing a crime, however slanderous it may be, is not enough to sustain a claim of false arrest so long as the decision whether to make the arrest remains with the police officer and is without the persuasion or influence of the accuser." *Id.* But "[t]he weight of authority holds that an informer who knowingly gives false information to a police officer necessarily interferes with the intelligent exercise of the officer's independent judgment and discretion and thereby becomes liable for a false arrest that later occurs." *Vessels v. District of Columbia*, 531 A.2d 1016, 1020 (D.C. 1987). Logic counsels that "[t]o consciously misstate the facts under such circumstances must be for the purpose of inducing action by the police." *Id.* For this reason, "[a] complainant is required to disclose . . . material facts; that is, facts material to the alleged crime charged, facts which would have a tendency to throw light upon whether any malicious mischief was in fact committed,

and who in all probability committed them. Immaterial facts need not be stated." *Sears Roebuck & Co. v. Gault*, 175 A.2d 795, 797 (D.C. 1961)

Provided all material facts are disclosed, complainants "may without fear of civil reprisal for an honest mistake, report to the police or public prosecutor the facts of a crime and in good faith, without malice, identify to the best of their ability . . . the perpetrator of the crime." *Smith*, 399 A.2d at 219. "It is settled that merely giving facts to an officer showing that an offense has been committed and that a person may be suspected of its commission does not comprise the tort of false imprisonment." *Id.* at 218. *Cf. Smith v. Tucker*, 304 A.2d 303, 308 (D.C. 1973) ("Where . . . a crime of a serious nature has been committed and from the admitted facts or uncontradicted evidence it appears that the injured party *has done nothing more than take reasonable and proper steps for the discovery and apprehension of the criminal* that party merits, and should receive, the protection of the court." (emphasis added)).

Here, the three Jail officials did not merely tell Officer Henley what they saw; they omitted several material facts they either knew or should have taken reasonable and proper steps to discover. Clay, Waldren, and White all acknowledge they did not see what happened before the assault. Clay admitted he "had no idea what had transpired between" Amobi and Brown before he arrived on the scene. S.A. 231. Nevertheless, Clay told Officer Henley that Amobi's claim of self-defense was "not true." S.A. 172. Waldren conceded he did not know what led to the "physical contact," S.A. 372, and that he could not "testify one way or another as [to] whether Mr. Brown ever put his hand on Mr. Amobi," S.A. 378. White confessed Brown's arms were not always visible from the hallway as he and the other officials approached, S.A. 388,

and that he had a compromised view through the metal gate and into the sally port, *id.* None of these facts were disclosed to Officer Henley. *See* S.A. 190. Furthermore, Waldren knew it was "standard operating procedure to take photographs of injured officers," S.A. 18, and to "afford [them] medical attention," S.A. 16. And White knew photographs of Amobi's injuries had been taken and that surveillance footage may have been available. S.A. 22–23, 177. Yet neither officer took reasonable steps to determine whether the photographs or medical examination of Amobi suggested Brown had initiated the assault. In fact, White admitted he had no reason to disbelieve Amobi's claim of self-defense, and Waldren and White saw that Amobi was using what they recognized as a restraint technique taught to COs.

At the very least, the preceding facts demonstrate the Jail officials had no "honest belief" that Amobi did not act in self-defense. *See Vessels*, 531 A.2d at 1020–21; *Tucker*, 304 A.2d at 307. Moreover, none of the officials took reasonable steps to secure and submit to Henley the exculpatory statements from COs Wallace, Taylor, and Harris, despite Waldren's acknowledgment that it was his duty to oversee and manage the approximately 600 COs at the Jail. Failing to disclose the foregoing material facts evinces a lack of good faith and is equivalent to "Officer, arrest that man." *Smith*, 399 A.2d at 218. Accordingly, we reverse the grant of summary judgment on this claim as to Clay, Waldren, and White, but affirm as to the other parties.

3

Genuine issues of material fact persist concerning whether probable cause existed for both the initiation and continuation of Amobi's prosecution. To support a malicious prosecution claim, "[t]here must be (a) a criminal proceeding *instituted or*

*continued* by the defendant against the plaintiff, (b) termination of the proceeding in favor of the accused, (c) absence of probable cause for the proceeding, and (d) Malice, or a primary purpose in instituting the proceeding other than that of bringing an offender to justice." *DeWitt v. District of Columbia*, 43 A.3d 291, 296 (D.C. 2012) (emphasis added).

In the District, a common law claim of malicious prosecution encompasses criminal, civil, and administrative proceedings. *See Melvin v. Pence*, 130 F.2d 423, 426 (D.C. Cir. 1942). "The issue in a malicious prosecution case is not whether there was probable cause for the initial arrest, but whether there was probable cause for the underlying suit." *Pitt v. District of Columbia*, 491 F.3d 494, 502 (D.C. Cir. 2007); *Dellums v. Powell* (*Dellums II*), 566 F.2d 216, 220 (D.C. Cir. 1977) (noting that in the criminal context, "the critical event triggering liability for malicious prosecution is the filing of an information"). Nevertheless, a malicious prosecution claim is sustained where the proceeding is "induced by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith." *Moore v. Hartman*, 571 F.3d 62, 67 (D.C. Cir. 2009); *Dellums v. Powell* (*Dellums I*), 566 F.2d 167, 192 (D.C. Cir. 1977); *Melvin*, 130 F.2d at 428 ("Instigation is sufficient, when institution [of a criminal, civil, or administrative proceeding] actually follows from it."). Additionally, "appearing in court and testifying and keeping the prosecution alive" creates a genuine issue of dispute as to whether a defendant continued a malicious prosecution. *See Viner v. Friedman*, 33 A.2d 631, 632 (D.C. 1943); *see also id.* at 633.

Before turning to the merits, we must quickly dispense with Appellees' contention that the claim is time-barred. Appellees appear to calculate the statute of limitations from the date the malicious prosecution was initiated—June 4,

2006—instead of from the date the prosecution was terminated in Amobi's favor—June 4, 2008. The former method is incorrect. *See Shulman v. Miskell*, 626 F.2d 173, 174–75 (D.C. Cir. 1980).

Turning to the merits, we note Appellees dispute only prongs (c) and (d)—the existence of probable cause and whether malice was shown.[9] *See* Appellees' Br. at 25–28. We think our discussion of probable cause for the false arrest is sufficiently analogous so as to be dispositive on the malicious prosecution claim. The record is clear that the U.S. Attorney's Office relied on the Jail officials' statements. *See* Appellants' Br. at 10 (noting that the Jail officials' statements were among the documents produced to Amobi during discovery). Similarly, we think the Jail officials' lack of good faith and honest belief suggests the primary purpose in instituting and continuing (by testifying against Amobi at trial) the criminal proceeding was for some purpose "other than . . . bringing an offender to justice." *DeWitt*, 43 A.3d at 296. Even were that not the case, it is axiomatic that malice may be presumed from the lack of probable cause. *Viner*, 33 A.2d at 632. As such, the malicious prosecution claim should have been submitted to the jury. *Pitt*, 491 F.3d at 504 ("The determination of malice is exclusively for the factfinder.").

In addition to the criminal prosecution, the record raises genuine issues of material fact regarding whether Director Brown and Toni Shell continued the administrative proceeding

---

[9]   The district court concluded Amobi did not allege any defendant acted with malice. *Amobi*, 882 F. Supp. 2d at 82 n.4. This is demonstrably false. Amobi's complaint alleged each defendant acted with malice. *See* P.A. 32, 34, 36–37, 39.

against Amobi without probable cause.[10] As recounted above, Nguyen (the hearing officer) initially found inadequate evidence to terminate Amobi, S.A. 209, but Director Brown and Shell pressured her to reach a different conclusion, S.A. 43, 47, 50.[11] Similarly, the Director elected to proceed with the arbitration although the District's attorney had detailed numerous discrepancies in the District's case against Amobi. *See* Part I.D., *supra*. Of most concern is Director Brown's tacit ratification of Patten and Beard's fabricated interview memorandum. The interview memorandum, which was drafted on the same day as Amobi's notice of summary dismissal, formed part of the evidentiary basis for Amobi's summary discharge. Brown knew this portion of evidence was now in dispute. For these reasons, the district court erred in granting summary judgment on the malicious prosecution claim. Thus, we reverse the grant of summary judgment on this claim as to Director Brown, Clay, Waldren, White, and the District.

4

Amobi also sought relief for malicious prosecution under 42 U.S.C. § 1983, asserting that Appellees deprived him of his

---

[10] Toni Shell was not named as a defendant in the common law malicious prosecution claim.

[11] The district court suggested Director Brown was justified in remanding Nguyen's decision because the "initial written recommendation was quite conclusory in nature." *Amobi*, 882 F. Supp. 2d at 82. We are not convinced. Each recommendation was of equal length, *compare* S.A. 201–02, *with* S.A. 208–09, and Nguyen was not given any new evidence to consider in her second recommendation, *see* S.A. 47. Yet, despite the seemingly cursory analysis of *both* recommendations, Director Brown took issue only with the first.

constitutional rights by initiating criminal proceedings against him without probable cause. As with the common law claim, disputed issues of material fact exist here, too. "[M]alicious prosecution is actionable under 42 U.S.C. § 1983 to the extent that the defendant's actions cause the plaintiff to be unreasonably 'seized' without probable cause, in violation of the Fourth Amendment." *Pitt*, 491 F.3d at 511. Nevertheless, because the relevant conduct at issue in this case occurred before we issued our decision in *Pitt*, clearly establishing malicious prosecution as a violation of constitutional rights, qualified immunity is appropriate here. That the Defendants failed to make this argument in their briefs in this court is of no moment because they raised the issue in the district court. *See* P.A. 72, 82–85; *see also Jones v. Bernanke*, 557 F.3d 670, 676 (D.C. Cir. 2009) ("[W]e may affirm a judgment on any ground the record supports and that the opposing party had a fair opportunity to address"). Accordingly, we affirm the district court's grant of summary judgment as to all Defendants on Amobi's constitutional malicious prosecution claim.

5

Amobi argues the district court erred in holding his common law defamation claim is time-barred. He is wrong. D.C. Code § 12-301(4) establishes a one-year statute of limitations for common law defamation claims. Amobi filed his complaint on June 4, 2008, two years after his defamation injury accrued. Nevertheless, Amobi maintains the common law claim is not time-barred because "Defendants' defamatory statements and reckless disregard for the truth were continuing," Appellants' Reply Br. at 13, and therefore tolled the statute of limitations. We are not persuaded.

"The statute of limitations on a tort claim ordinarily begins to run when the plaintiff sustains a tortious injury . . . ." *Beard v. Edmondson & Gallagher*, 790 A.2d 541, 546 (D.C. 2002). "At the latest . . . a cause of action accrues for limitations purposes when the plaintiff knows or by the exercise of reasonable diligence should know (1) of the injury, (2) its cause in fact, and (3) of some evidence of wrongdoing." *Id.* Here, it is undisputed that, as of June 4, 2006, Amobi knew of his injury and the role Appellees played in causing it. The question is whether the continuation of the criminal litigation delayed the accrual of Amobi's cause of action. "A 'continuous tort' can be established for statute of limitations purposes by showing (1) a continuous and repetitious wrong, (2) with damages flowing from the act as a whole rather than from each individual act, and (3) at least one injurious act . . . within the limitation period." *Id.* at 547–48. Yet, under D.C. law, continuous defamatory statements do not toll the statute of limitations. *Id.* The only exception—not applicable here—is "if the continuing tort has a cumulative effect, *such that the injury might not have come about but for the entire course of conduct*." *Id.* at 548 (emphasis in original). Thus, because Amobi knew, as of June 4, 2006, that he had been injured, the statute of limitations began to run and was not tolled.

6

Amobi fares no better on his constitutional defamation claim. As a threshold matter, the parties dispute whether Amobi adequately pled a constitutional defamation claim under § 1983. We need not resolve the dispute however, because even assuming the claim is adequately pled, Amobi is not entitled to further relief.

In his reply brief, Amobi claims to have pled a reputation-plus defamation claim under § 1983. Appellants' Reply Br. at 14. Amobi asserts his defamation "stemmed from the constitutional violation of his due process rights by depriving him of his property interest in his employment." *Id.* at 14–15. A plaintiff may be able to state a due process claim based on the allegedly defamatory actions of government officials if "the defamation [is] accompanied by a discharge from government employment or at least a demotion in rank and pay." *Mosrie v. Barry*, 718 F.2d 1151, 1161 (D.C. Cir. 1983). This type of action "is usually termed a reputation-plus claim." *O'Donnell v. Barry*, 148 F.3d 1126, 1140 (D.C. Cir. 1998). The remedy for an established reputation-plus claim is "an opportunity to refute the charge," one which will "provide the person an opportunity to clear his name." *Codd v. Velger*, 429 U.S. 624, 627 (1977); *McCormick v. District of Columbia*, No. 12-7115, 2014 WL 2178831, at *9 (D.C. Cir. May 27, 2014). Here, Amobi had an opportunity to refute the charges at both a criminal judicial proceeding and an administrative arbitration. This was sufficient. Thus, even assuming Amobi adequately pled a claim for constitutional defamation, he received all the process he was due, and the claim is therefore moot.[12]

---

[12] Amobi also was afforded adequate pre-termination due process. The Supreme Court has suggested that the way to ensure pre-termination due process rights are preserved is to suspend an employee accused of detrimental conduct with pay. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 544–45 (1985); *Munoz v. Bd. of Trs. of Univ. of Dist. of Columbia*, 427 F. App'x 1, 3 (D.C. Cir. 2011). That is exactly what happened here. Clay ordered Amobi placed on paid administrative leave, *see* P.A. 45, 49, and Amobi's termination was not finalized until August 29, 2006, *see* S.A. 203. In any event, in the district court Amobi argued only that his termination infringed his procedural due process rights because Director Brown's "remand" of Nguyen's decision violated the CBA.

We turn finally to Amobi's IIED claim. The district court concluded there was "no evidence that any of the defendants engaged in extreme or outrageous conduct or that Amobi suffered severe emotional distress." *Amobi*, 882 F. Supp. 2d at 84. We disagree.

"Establishing a prima facie case of intentional infliction of emotional distress requires a showing of (1) extreme and outrageous conduct on the part of the defendants, which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Futrell v. Dep't of Labor Fed. Credit Union*, 816 A.2d 793, 808 (D.C. 2003). The conduct alleged must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community." *Bernstein v. Fernandez*, 649 A.2d 1064, 1075 (D.C. 1991). "Where reasonable persons may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability." *Homan v. Goyal*, 711 A.2d 812, 818 (D.C. 1998).

Amobi argues that our affirmance of a jury verdict for IIED in *Pitt* is instructive in this case. We concur. In *Pitt*, the plaintiff was falsely arrested for robbery although both victims of the crime told the police that the plaintiff was not the perpetrator. 491 F.3d at 502. The police affidavit subsequently submitted to the prosecutor's office contained no

---

*See* P.A. 91. Because the collective bargaining agreement clearly authorized the remand, and because Amobi failed to argue that the pre-termination proceedings were otherwise constitutionally defective, we affirm the district court's dismissal of this claim.

mention of the victims' negative identifications, despite containing inconsequential details about the robbery and the stop of plaintiff's car. *Id.* at 504. The affidavit also contained one unambiguously false statement—that the plaintiff was observed "getting into a car within seconds after a building employee saw the robber leave the building," when, in fact, "the perpetrator had been gone for at least eight minutes by the time the police spotted [the plaintiff] in the area." *Id.* In addition, there was a dispute about whether the officers' notes describing the show-up identification in detail was included in the case file submitted to prosecutors; the officer did not recognize the notes and did not know if those had been shown to the prosecutors. *Id.* Based upon this evidence, we affirmed the jury's verdict, noting the "material misstatements" and "glaring omissions" in the arrest report and affidavit submitted to prosecutors. *Id.* at 504, 506.

As recounted above, the facts here bear some resemblance to those in *Pitt.* As in *Pitt*, Clay, Waldren, and White's incident report contained several glaring omissions, and at least one false statement, which was later ratified by Director Brown. From these facts, we think it clear that genuine issues of material fact exist and that it was for the jury to determine whether the conduct has been sufficiently extreme and outrageous to result in liability. For these reasons, the grant of summary judgment is reversed as to Director Brown, Clay, Waldren, White, and the District.

\*\*\*\*

The district court's order is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

*So ordered.*