# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 17, 2014          Decided July 17, 2015

No. 12-7114

VANESSA COLEMAN,
APPELLANT

v.

DISTRICT OF COLUMBIA, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:09-cv-00050)

*Jatinique Randle*, Student Counsel, argued the cause for appellant. On the briefs was *Aderson Bellegarde Francois*.

*Carl J. Schifferle*, Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellees. With him on the brief were *Irvin B. Nathan*, Attorney General, *Todd S. Kim*, Solicitor General, and *Loren L. AliKhan*, Deputy Solicitor General.

Before: BROWN and MILLETT, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

Dissenting opinion filed by *Circuit Judge* BROWN.

MILLETT, *Circuit Judge*: Following a major fire in which a high-rise apartment building was destroyed, the District of Columbia Fire and Emergency Medical Services Department took disciplinary action against the Appellant, Fire Captain Vanessa Coleman. That disciplinary proceeding set off a series of charges and complaints by Coleman and counter-charges by the Department, culminating in Coleman's discharge.

Coleman subsequently filed a lawsuit that included a claim under the District of Columbia Whistleblower Protection Act ("Whistleblower Act"), D.C. Code §§ 1–615.51 *et seq.* On the Department's motion for summary judgment, the district court grouped Coleman's numerous communications with her supervisors into broad categories, and then granted summary judgment to the Department on the ground that most of those categories were not statutorily protected types of communications, and for the one group that was protected, the Department had articulated a legitimate, non-retaliatory reason for its actions.

Whistleblower protection, however, is not disbursed or denied *en masse*. And the Whistleblower Act imposes a rigorous burden on defendants to establish by clear and convincing evidence the legitimate reasons for an adverse action. When Coleman's complaints are considered individually rather than categorically, a reasonable jury could conclude that one or more of them qualifies as a protected complaint under the Whistleblower Act. Coleman also came forward with sufficient evidence for a reasonable jury to find a *prima facie* case of retaliation as to those complaints. The Department, for its part, failed to meet its demanding summary judgment burden of establishing that any reasonable

juror would have to find by clear and convincing evidence that it had legitimate, non-retaliatory reasons for its actions.

We therefore reverse the grant of summary judgment as to those aspects of Coleman's Whistleblower Act claim. With one exception, we affirm the district court's grant of summary judgment as to Coleman's other challenges.

# I

## Statutory Framework

The purpose of the District of Columbia's Whistleblower Act is "to encourage disclosure of wrongdoing to persons who may be in a position to act to remedy it." *Wilburn v. District of Columbia*, 957 A.2d 921, 925 (D.C. 2008) (emphasis omitted). The Whistleblower Act thus is designed to combat serious misconduct, abuses of governmental authority, or waste of public resources by creating an environment in which government employees who witness wrongdoing feel safe coming forward and are protected from retaliation. *See* D.C. Code § 1-615.51; *see also id.* §§ 2-223.01–2-223.07 (extending similar protections to, *inter alia*, employees of contractors for the D.C. government).

Sometimes, however, a workplace complaint is just a workplace complaint. To qualify as protected whistleblowing, the complaint must disclose "such serious errors by the agency that a conclusion the agency erred is not debatable among reasonable people." *Wilburn*, 957 A.2d at 925; *see also Williams v. Johnson*, 776 F.3d 865, 870 (D.C. Cir. 2015) (same). More specifically, the Act defines "protected disclosures" as those that the would-be whistleblower "reasonably believes" evidence:

(A) Gross mismanagement;

(B) Gross misuse or waste of public resources or funds;

(C) Abuse of authority in connection with the administration of a public program or the execution of a public contract;

(D) A violation of a federal, state, or local law, rule, or regulation, or of a term of a contract between the District government and a District government contractor which is not of a merely technical or minimal nature; or

(E) A substantial and specific danger to the public health and safety.

D.C. Code § 1-615.52(a)(6); *see also Williams*, 776 F.3d at 870 (discussing scope of Whistleblower Act protection).

For complaints falling within those categories, the Act bars a supervisor from "tak[ing] or threaten[ing] to take, a prohibited personnel action or otherwise retaliat[ing] because of the employee's protected disclosure or because of an employee's refusal to comply with an illegal order." D.C. Code § 1-615.53(a).

The Act prescribes a distinct burden-shifting framework to govern the proof of whistleblowing claims. *See Bowyer v. District of Columbia*, No. 13-7012, 2015 WL 4079800, at *2 (D.C. Cir. July 7, 2015). To make out a *prima facie* claim of retaliation under the Whistleblower Act, the plaintiff must show by a preponderance of the evidence that (i) she made a statutorily protected disclosure, and (ii) the disclosure was a "contributing factor" behind (iii) an adverse personnel action taken by her employer. *See Crawford v. District of Columbia*, 891 A.2d 216, 219, 221 (D.C. 2006). A "contributing factor" is "any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the

[employment] decision." D.C. Code § 1-615.52(a)(2). Once a plaintiff establishes a *prima facie* case, the burden shifts to the employer to "prove by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in activities protected by this section." *Id.* § 1-615.54(b); *see also Freeman v. District of Columbia*, 60 A.3d 1131, 1141 (D.C. 2012).

**Factual Background**

Appellant Vanessa Coleman is a 17-year veteran of the D.C. Fire Department. She began as a cadet after graduating from high school and rose through the ranks to become a captain in command of an engine company.

On March 12, 2008, a large fire broke out in a high-rise apartment building in the Mount Pleasant neighborhood of Washington, D.C. It developed into a five-alarm fire that destroyed the entire structure and left its nearly 200 residents homeless. Coleman headed an engine company that responded to the fire. Battalion Fire Chief John Lee served as the Incident Commander, and directed the operations of firefighters on the scene, including Coleman's company.

Upon arriving at the fire, Coleman led her company to inspect the basement of the building, as required by the Department's Standard Operating Guidelines. Before she could reach the basement, however, Battalion Chief Lee instructed her to proceed directly to the third floor of the building. Coleman abandoned the basement check, following her superior's command. Coleman did not advise Lee that the basement inspection had not been completed. Nor did Lee confirm its completion with Coleman or anyone else.

The fire proved to be one of the largest in D.C.'s recent history. Failure to complete the basement check proved fatal to the Department's efforts to control the fire, which had in fact begun in the basement. The fire and the Fire Department's failure to contain it generated widespread public attention and criticism.

In the following days, the Department conducted an informal internal critique of the Mount Pleasant fire that included an inquiry into Coleman's actions. In response, Coleman sent memoranda to her superiors explaining her actions, and advocating that a formal review of the Mount Pleasant fire be undertaken to investigate all of the departmental failures that day.

On April 5, 2008, Battalion Chief John Lee issued Coleman a citation for violating the Standard Operating Guidelines and the District of Columbia Fire and Emergency Medical Services Department Order Book "by (1) not reporting her basement findings to Command; or (2) if unable to perform this assignment as so ordered by Command, immediately notify[ing] Command of this fact." J.A. 150. Coleman refused to accept a settlement penalty, and instead exercised her right to challenge the charge.

On April 21, 2008, Coleman wrote a memorandum to Fire Chief Dennis Rubin explaining that she was challenging the charge "because the violation referenced was not an omission of neglect on [her] behalf. Instead, the error resulted from the tactical decision of the IC [Incident Commander John Lee]." J.A. 215. In Coleman's view, "the execution of the basement check wasn't completed by [her company] because the IC (deviating from standard protocol) ordered [her company] to a greater assignment of priority." *Id.* This, Coleman asserted, evidenced a failure to properly manage fire

operations and to contain a large, multi-alarm fire. She also repeated her recommendation that the Department conduct a thorough and formal review of command failures at the Mount Pleasant fire.

Four days later, on April 25, Battalion Chief John Lee was cited for failing to follow up with Coleman's company regarding a basement report. Unlike Coleman, however, Lee decided not to challenge the citation, and accepted an official reprimand.

In May 2008, while Coleman awaited her hearing, she wrote another memorandum to Chief Rubin, this time complaining that, since April, her superiors had been failing to endorse and timely process disciplinary actions she initiated against her subordinates. When she received no response from Chief Rubin, she continued over the next two months to submit almost a dozen memoranda to the Chief complaining that, among other things, her superiors were collectively and intentionally ignoring her requests for disciplinary support, misusing their authority to "cripple" her professional career, and orchestrating a "mutiny" against her by subverting her efforts to discipline those in her command. J.A. 246, 267. Coleman also sent multiple communications to Assistant Fire Chief Brian Lee expressing concern that her disciplinary notices were not being timely processed.

On May 19, 2008, Battalion Fire Chief James Kane heard Coleman's appeal of her April 5th citation. He found her guilty of the infraction, and recommended that she be suspended for 24 duty hours. Assistant Chief Brian Lee approved the recommendation.

On July 23, 2008, Coleman appealed her suspension to Chief Rubin. In doing so, she filed a memorandum that not only defended her own actions at the Mount Pleasant fire, but

also provided a detailed account of what she believed were major command failures and dangerous practices by the Department at the fire site. They included (i) failing to ensure that each floor was checked and instead channeling resources to the second floor in a mistaken belief that the fire originated there, (ii) neglecting to request adequate resources at the outset, (iii) untimely activating a second alarm to increase fire-fighting resources, and (iv) requiring firefighters to work in exceptionally dangerous conditions even though experts knew early on that the building could not be saved. Coleman explained that those failures both caused the loss of the building and unnecessarily put firefighters at "extreme risk." J.A. 297.

While Assistant Chief Brian Lee had previously contemplated the possibility of subjecting Coleman to a fitness examination, within 48 hours of receiving the July 23rd memorandum, he pulled the trigger and ordered that Coleman immediately undergo an evaluation of her psychological fitness for duty. He grounded his order in "her constant and sometimes alarming e-mails and reports about possible conspiracy in the work place; and her inability to adhere to directives given by myself and other Superior officers," concluding that the Department needed to "determine if there is a medical cause for this behavior." J.A. 306.

On July 28, 2008, Chief Rubin affirmed the May 19th administrative decision suspending Coleman for her performance at the Mount Pleasant fire. Three days later, Coleman reported for the fitness-for-duty evaluation as ordered, but refused to sign the requisite consent form because it required her to attest that her participation was voluntary. She was concerned about waiving challenges to the test results and releasing her medical records. That same

day, she submitted a memorandum to Chief Rubin stating that she believed she was being ordered to take the psychological examination in retaliation for "whistle blowing" and that she "was uncomfortable consenting to the waiver form without first acquiring legal guidance." J.A. 327. The Department responded by charging Coleman with insubordination.

Coleman informed the Department that she would not complete the fitness-for-duty examination unless certain changes were made to the waiver form so that she could record that she was submitting to the evaluation "under duress and under the threat of further retaliation or adverse personnel action." J.A. 81. At that point, the Department put the examination and insubordination charge on hold pending the outcome of an equal employment investigation into her charges. Once that investigation concluded with no action, the Department reinstated the order that Coleman undergo the fitness evaluation. Coleman, however, continued to refuse to consent to the testing. On January 13, 2009, the Department formally commenced insubordination proceedings against her.

The Department's Trial Board found Coleman guilty of two counts of insubordination. The Board recommended that she receive a demotion of two ranks and be ordered again to submit to the fitness-for-duty examination. Chief Rubin agreed.

Coleman again refused to give her voluntary consent to the examination, despite a warning that it could lead to her termination. The Department terminated Coleman on October 7, 2009.

## Procedural History

Coleman subsequently filed suit in the United States District Court for the District of Columbia alleging violations

of the Whistleblower Act, along with other state and federal causes of action.[1] Coleman named as defendants the Department, Chief Rubin in his official capacity, and Assistant Chief Brian Lee in his individual capacity (collectively, "Department"). Coleman alleged that her memoranda and other communications were statutorily protected disclosures to Department management exposing abuse of authority, gross mismanagement, violations of federal and local laws, violations of Department rules, and substantial and specific dangers to public health and safety. She further alleged that she was unlawfully retaliated against as a result of those protected disclosures through reprimands, suspensions, orders to submit to the fitness-for-duty evaluation, and eventually termination.

The district court granted summary judgment for the Department and dismissed Coleman's complaint. Grouping Coleman's communications into seven broad categories (such as all "internal [intra-Department] communications regarding the Mount Pleasant fire"), the court concluded that only three categories of communications were even arguably protected by the Whistleblower Act. *Coleman v. District of Columbia*, 893 F. Supp. 2d 84, 93, 101 (D.D.C. 2012). Those three categories covered Coleman's internal and external communications and legal filings alleging race and sex discrimination in the Department, and thus could be protected allegations revealing violations of federal and local law. Coleman's communications regarding the Mount Pleasant fire, however, were categorically dismissed as pertaining only to an internal disciplinary matter. *Id.* at 101–102.

---

[1] The federal claims gave rise to federal question jurisdiction, as well as supplemental jurisdiction over Coleman's Whistleblower Act and other related state-law claims. *See* 28 U.S.C. §§ 1331, 1367.

With respect to the communications that the district court found were generally protected, the court held that, even assuming they were a substantial factor in sanctioning Coleman, the Department had an independent and legitimate reason for taking those actions. *Coleman*, 893 F. Supp. 2d. at 102. In so ruling, the court relied on certain justifications for the Department's actions that the court deemed to have been "impliedly offered" by the Department. *Id.* at 103. The court also relied on Coleman's acknowledgement that the challenged actions were taken in response to communications that the district court had said were categorically unprotected. *Id.* at 104. Because it had ruled that ordering the fitness-for-duty evaluation was not retaliatory, the district court also held that the Department's sanctions for Coleman's non-compliance with that order, including ultimately termination, were not retaliatory either. *See id.* at 105.

Finally, the court granted summary judgment on Coleman's First Amendment claim against Assistant Chief Lee, *see Coleman*, 893 F. Supp. 2d at 94–99, as well as her retaliation and hostile work environment claims under Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000 *et seq.*, and the District of Columbia's Human Rights Act, D.C. Code §§ 2-1401 *et seq. See Coleman*, 893 F. Supp. 2d at 105–109. Coleman does not challenge those rulings on appeal.[2]

---

[2] The district court had dismissed Coleman's other constitutional and common law claims in a December 7, 2011 order granting the Department partial judgment on the pleadings. *See Coleman v. District of Columbia*, 828 F. Supp. 2d 87, 90–97 (D.D.C. 2011). Coleman has not presented any objection to that ruling on appeal.

## II

### Analysis

We review the district court's grant of summary judgment *de novo*, drawing all reasonable inferences from the evidence in favor of the nonmoving party. *See Payne v. District of Columbia*, 722 F.3d 345, 351 (D.C. Cir. 2013). Summary judgment may only be granted when there is no genuine dispute as to any material fact, and the moving party—in this case, the Department—is entitled to judgment as a matter of law under the governing legal standard. *Id.*

Under the Whistleblower Act, once a *prima facie* case has been established, the defendant must prove by clear and convincing evidence that it had a legitimate, non-retaliatory reason for any adverse employment actions that were taken in the wake of a protected disclosure. D.C. Code § 1-615.54(b); *see also Bowyer*, 2015 WL 4079800, at *2. Accordingly, in reviewing the grant of summary judgment to the Department, we must "view the evidence presented through the prism of th[at]" clear and convincing "substantive evidentiary burden," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986); *see id.* ("Whether a jury could reasonably find for either party * * * cannot be defined except by the criteria governing what evidence would enable the jury to find for either the plaintiff or the defendant.").

In reviewing a claim under the Whistleblower Act, this court applies the substantive law of the District of Columbia and "[o]ur duty * * * is to achieve the same outcome we believe would result if the District of Columbia Court of Appeals considered the case." *Payne*, 722 F.3d at 353.

13

### *Protected Disclosure*

At the summary judgment stage, the central question is whether a "reasonable juror 'with knowledge of the essential facts known to and readily ascertainable by the employee'" could find that one or more of Coleman's memoranda disclosed an "objectively serious" governmental act of gross mismanagement, gross misuse or waste of public funds, abuse of authority, a material violation of local or federal law, or a substantial and specific danger to public health and safety. *Williams*, 776 F.3d at 871–872.[3] Whether the employee made a protected disclosure is often "a 'fact specific inquiry.'" *Williams*, 776 F.3d at 870 (quoting *Shekoyan v. Sibley Int'l*, 409 F.3d 414, 423 (D.C. Cir. 2005)).

Applying that standard, a reasonable jury could find that Coleman's July 23rd memorandum cataloging serious and potentially life-endangering problems with the Department's response to the Mount Pleasant fire was a protected disclosure. That memorandum contained a detailed account of the multiple departmental command failures Coleman observed at the Mount Pleasant fire, which was one of the most devastating fires in recent Department history and which had generated public scrutiny and criticism of departmental operations. Coleman pointed with specificity to how inaccurate reports about conditions inside the burning building impeded firefighters' ability to pinpoint the location of the fire, which is critical to containing a fire. She also described the Department's lack of attention to established firefighting procedures, such as failing to check each floor as firefighters ascended, and to the misdirection of resources,

---

[3] *See also Wilburn*, 927 A.2d at 925; *Zirkle v. District of Columbia*, 830 A.2d 1250, 1259–1260 (D.C. 2003); D.C. Code § 1-615.52(6)(A)-(E).

citing in particular an order diverting units to the second and third floors. Coleman's memorandum went on to explain that there were insufficient firefighters on the scene to extinguish what ended up being a five-alarm fire or to contain its spread. As a consequence, the firefighters on the scene suffered from "fatigue and mental exhaustion." J.A. 297. She also alleged that alarms calling in additional units to help fight the fire were unjustifiably delayed. Lastly, Coleman states that "on scene experts knew some 10 minutes into the fire that the building wouldn't be saved" and that, in spite of this knowledge, "interior [firefighting] crews were put at extreme risk." *Id.*

A reasonable jury could conclude that the July 23rd memorandum disclosed either gross mismanagement or a "substantial and specific danger to the public health and safety," topics specifically protected by the Whistleblower Act. D.C. Code § 1-615.52(a)(6)(A) & (E). If true (a matter on which we express no opinion), the statements would reveal serious and potentially life- and property-endangering errors by the D.C. Fire Department in managing the blaze. The memorandum is detailed and specific; it is not a general undifferentiated complaint that contributes little to the disclosure of actual governmental misconduct. The concerns raised, moreover, bore directly on a matter of significant public concern—the much-scrutinized Mount Pleasant fire.

The disclosures thus go far beyond a mere difference of opinion among employees or self-interested finger-pointing by Coleman. Instead, if true, they would reveal official missteps that stand separate and apart from Coleman's individualized personnel dispute over responsibility for checking the basement.

In granting summary judgment to the defendants, the district court grouped all of Coleman's "internal [intra-Department] communications regarding the Mount Pleasant fire" together and declared that entire category to be unprotected because Coleman's concern was to preserve her "own career" and to fend off the Department's "erroneous citation of [her] for a professional error." *Coleman*, 893 F. Supp. 2d at 101.

The question, however, is whether a reasonable jury could find that *any*, not *all*, of Coleman's internal complaints were protected. And that inquiry turns on whether an individual disclosure might "reasonably" be viewed as revealing "objectively serious" misconduct. *Williams*, 776 F.3d at 871–872. The whistleblower's subjective motivation is beside the point. *See id.* Indeed, there is nothing inherently contradictory about disclosing serious misconduct while also defending one's own professional reputation. The proper focus thus is on the objective content of the information revealed, not the motives of the revealer. *Cf. Horton v. Department of Navy*, 66 F.3d 279, 282–283 (Fed. Cir. 1995) (discussing Congress's rejection of employee motive as a factor in determining whether a disclosure is protected under the federal whistleblower law); *see also Freeman*, 60 A.3d at 1141 ("In construing the [Whistleblower Act], we have found it helpful to consider how its federal counterpart, 5 U.S.C. § 2302(b)(8)(B) (2008), and similar state whistleblower laws have been interpreted.").

Finally, the Department's objection (Br. 28) that aspects of the disclosure were "rumor" or "too vague and unsupported to be a protected disclosure" simply ignores the specific content and details laid out in the July 23rd memorandum. The argument also overlooks that Coleman was a 17-year veteran of the D.C. Fire Department, who had earned her way

up to the level of Captain. She thus had first-hand experience fighting fires in the District, and was familiar with the Department's command and containment protocols. Her "expertise in these matters supports the reasonableness of her belief" that the Department's actions posed a substantial threat to public safety. Or at least a reasonable jury could so find. *Chambers v. Department of the Interior*, 602 F.3d 1370, 1379 (Fed. Cir. 2010).

While it presents a closer question, a reasonable jury could also find that Coleman's April 21st memorandum to Chief Rubin was a protected disclosure because it disclosed that Battalion Chief John Lee had reassigned Coleman's company before the basement check had been completed. Coleman's memorandum did not simply assert her blamelessness in the missed basement check, but instead went further and disclosed that Lee independently had failed to follow up on and confirm that the basement check had been completed. Given how critical that check was to the fire's containment, a reasonable jury could find that Lee's oversight created a significant safety risk. Indeed, four days after Coleman's memorandum, the Department cited Lee for the very conduct that Coleman had described.

Coleman also claims on appeal that an April 1st memorandum expressing her concern over the Department's decision to conduct only an informal, rather than formal, investigation of the Mount Pleasant fire was protected. We disagree. No reasonable jury could find that the decision whether to proceed at least initially through an informal rather than a formal investigatory process is the kind of serious error that is "not debatable among reasonable people." *White v. Department of Air Force*, 391 F.3d 1377, 1383 (Fed. Cir. 2004). The April 1st memorandum also lacks the detail and specificity needed to link the complaints to public safety. *See*

*Chambers*, 602 F.3d at 1376 (disclosure "reveal[ed] a substantial and specific danger to public health and safety" because there were "specific allegations or evidence either of actual past harm or of detailed circumstances giving rise to a likelihood of impending harm").

Finally, we decline to consider whether Coleman's July 31st memorandum to Chief Rubin explaining why she refused to submit to the fitness-for-duty examination is a protected disclosure. Coleman made no effort in her opening brief to link this disclosure, which postdated the evaluation order, to further acts of retaliation. If she meant instead to wrap this disclosure in a broader claim that she was retaliated against for refusing to comply with an unlawful order, that theory was forfeited on appeal because it was presented only in her reply brief. *See Novak v. Capital Mgmt. & Development Corp.*, 570 F.3d 305, 316 n.5 (D.C. Cir. 2009).

### *Retaliation*

Identifying a protected communication was only half of Coleman's summary-judgment task. That is because blowing the whistle does not immunize employees from any and all employment actions; it only protects against those adverse employment actions for which the employee's disclosure or attempted disclosure was "essentially * * * a 'but for'" cause. *Johnson v. District of Columbia*, 935 A.2d 1113, 1119 (D.C. 2007). The Whistleblower Act spells out specifically how that causation standard is to be met. First, Coleman had to come forward at summary judgment with sufficient evidence from which a reasonable jury could conclude both that her communication was protected and that her whistleblowing was a contributing factor to a "prohibited personnel action," D.C. Code § 1-615.54(b). *See Payne*, 722 F.3d at 353; *see also Freeman*, 60 A.3d at 1141.

Once Coleman met that burden, the Whistleblower Act required the government to show that there was no disputed question of fact that the challenged action would have occurred for legitimate reasons independent of Coleman's protected disclosure. More specifically, the government had to prove that any reasonable juror would have to find that the government had proven the legitimacy of its action by "clear and convincing evidence," D.C. Code § 1-615.54(b). *See Freeman*, 60 A.3d at 1141; *see also Bowyer*, 2015 WL 4079800, at *2.

At the outset, the Department does not dispute that the ordered fitness-for-duty examination, citation, suspension, and ultimate discharge of Coleman constitute the types of adverse employment actions that implicate the Whistleblower Act's protections. *See* D.C. Code § 1-615.52(a)(5)(A) (defining prohibited personnel action as including "recommended, threatened, or actual termination, demotion, suspension, or reprimand; * * * referral for psychiatric or psychological counseling; * * * or retaliating in any other manner"); *see also Freeman*, 60 A.3d at 1141.

In concluding that the Department had met its burden of justifying its employment actions, the district court committed two legal errors. It implied justifications the Department had not advanced, and it failed to enforce the Whistleblower Act's stringent burden of proof on the Department.

**1.** In identifying the Department's non-retaliatory basis for disciplining and discharging Coleman, the district court relied in part not on reasons given by the Department, but instead on those the court divined itself, and then deemed to have been "impliedly offered." *Coleman*, 893 F. Supp. 2d at 103. Proof in point: the district court stated that "defendants have not specifically alleged an independent justification for

[reprimanding plaintiff] in their motion for summary judgment"; instead, the court gleaned "possible justification[s]" from the record. *Id.* at 104; *see also id.* (stating that Coleman's "pleading has inadvertently assisted her opponents in constructing a justification for actions"). That a trial court may not do.

In answering a plaintiff's *prima facie* case, the burden is on the employer-defendant to come forward with its *actual* non-retaliatory justification for its employment decision. The text of the Whistleblower Act itself requires that "the defendant" rebut a showing of unlawful retaliation with proof that the challenged employment action "would have"—not could have—"occurred for legitimate, independent reasons" regardless of the allegedly protected activities. D.C. Code § 1-615.54(b). A trial court may not do the defendant's summary-judgment work for it.

Precedent in analogous contexts confirms that the text of the Whistleblower Act means what it says. The Supreme Court has repeatedly held for federal employment laws— where a defendant's burden is generally only one of *production*, rather than the Whistleblower Act's duty of clear and convincing *persuasion*—that the defendant must "clearly set forth, through the introduction of admissible evidence, the reasons for" its adverse employment actions. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 255 (1981); *see also St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509–510 (1993) (defendant must respond with "evidence which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action"); *cf. McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352 (1995) (holding that, where an employer's actual motive for an employee's termination was unlawfully

discriminatory, the *post hoc* advancement of reasons that could have led to termination does not avoid liability).

Beyond that, to hypothesize why a defendant could have taken an employment action is to ask the wrong question. The point of the Whistleblower Act's anti-retaliation provision is to make clear to employers that they cannot use their power to punish employees for whistleblowing or to cow them into silence. *See* D.C. Code § 1-615.51. Asking whether a misbehaving employer *could* have taken the same employment action for a legitimate reason, rather than whether the employer *did* so, would enfeeble the Act's most basic protection for employees and would open the door to after-the-fact justifications for employment actions that were, in fact, designedly retaliatory. That is not how causal analysis works in the analogous employment-discrimination context, and there is no textual or precedential reason to think the D.C. Council wanted a peculiarly anemic version of burden-shifting in the whistleblower context.

**2.** The district court also failed to analyze the Department's summary-judgment evidence under the exacting "clear and convincing" standard of proof that the Whistleblower Act imposes, D.C. Code § 1-615.54(b). *See McCormick v. District of Columbia*, 752 F.3d 980, 986 (D.C. Cir. 2014) (summary judgment on causation prong appropriate where the "only evidence" on this point supported the "independent lawful reasons" for termination offered by the defendant); *see also Liberty Lobby*, 477 U.S. at 254 (summary judgment must factor in "the criteria governing what evidence would enable the jury to find for either the plaintiff or the defendant").

More specifically, while the district court announced the correct standard, it failed to recognize that, under the

Whistleblower Act, the burden of persuasion *remains* on the defendant even once a legitimate and independent rationale for an action has been articulated. *Compare Freeman*, 60 A.3d at 1141 (defendant's burden under Whistleblower Act is to "*prove* by *clear and convincing evidence* that the alleged action would have occurred for legitimate independent reasons" absent the protected conduct) (emphases added) (quoting D.C. Code § 1-615.54(b)), *and Bowyer*, 2015 WL 4079800, at *2 (same), *with St. Mary's Honor Center*, 509 U.S. at 509 (defendant's analogous burden Title VII is simply to "*produc[e] evidence* (whether ultimately persuasive or not) of nondiscriminatory reasons") (first emphasis added).[4]

When the record is analyzed through the proper summary-judgment lens, a reasonable jury could conclude that (i) Coleman established a *prima facie* case of retaliation with respect to her referral for a fitness evaluation, and (ii) the Department failed to establish by clear and convincing evidence that it would have taken the challenged actions for legitimate, non-retaliatory reasons even in the absence of the protected conduct.

To begin with, Assistant Chief Lee openly rested his direction that Coleman undergo a fitness evaluation on her

---

[4] In that regard, the dissenting opinion is mistaken in suggesting (Dissenting Op. at 3–4) that the existence of a *prima facie* case becomes largely irrelevant at the summary judgment stage once the defendant asserts a legitimate, non-retaliatory reason for the adverse action. Under the plain text of the Whistleblower Act, D.C. Code § 1-615.54(b), Coleman's establishment of a *prima facie* case *permanently* shifted to the Department the burden of persuasion— by clear and convincing evidence, no less—that the challenged decision was not retaliatory. *See Bowyer*, 2015 WL 4079800, at *2, *4.

filing of numerous complaints with superiors, which included her April 21st and July 23rd communications detailing serious problems at the Mount Pleasant fire. Assistant Chief Lee specifically said that his decision was based in part on Coleman's "constant and sometimes alarming e-mails and reports about possible conspiracy in the work place," which he deemed "disruptive to * * * the efficient management of the Department." J.A. 306.

In addition, the close temporal proximity between the July 23rd memorandum in particular and the July 25th order that Coleman undergo a fitness examination supports an inference of causation. *See Payne*, 722 F.3d at 354 (close temporal proximity "can provide circumstantial evidence of causation"); *Freeman*, 60 A.3d at 1145 (proximity may "lend support to an inference of a causal relationship").[5]

Coleman also came forward with affirmative evidence that countered the Department's proffered rationale for ordering the examination—that her repeated memoranda suggested she was unbalanced. Coleman put into the record a declaration by a psychologist with significant experience in conducting fitness-for-duty examinations for the District's Police and Fire Clinic. After evaluating Coleman and reviewing the communications at issue and the testimony and affidavits of the relevant officials and medical personnel in the Department, Dr. Mitchell Hugonnet concluded that there was "little to no logical, psychological or medical basis to order Capt. Coleman to submit to a fitness for duty * * *

---

[5] Other evidence indicates that Assistant Chief Brian Lee at least contemplated having Coleman undergo a fitness-for-duty examination a week before her July 23rd memorandum. But it was within 48 hours of that protected memorandum that Lee chose to order the exam.

psychological evaluation." J.A. 579. Coleman also submitted an affidavit from a subordinate working in her Company at the time of the relevant events who attested to her fitness for duty, stating: "I never witnessed any erratic or disturbing behavior from Capt. Coleman. * * * [O]n the occasions that I have had to communicate with Capt. Coleman, I have observed no changes in her behavior, or witnessed conduct that would give DC Fire & EMS reason to question her physical or psychological abilities as an officer." J.A. 557.

The Department cherry picks a few words and phrases out of Coleman's memoranda and labels them "paranoid" and "disturbing," reasoning that such wording provided a legitimate basis for mandating the examination. Department Br. 11–12. Language, however, must always be read in context. And when the memoranda are read as a whole, there is no basis for holding that—as a matter of law—Coleman's occasional word choices so entirely devalued or discredited her substantive and detailed criticisms about fire management in the April 21st and July 23rd memoranda as to warrant summary judgment. While a jury could credit the Department's explanation, a jury could just as reasonably agree with Dr. Hugonnet's judgment that the memoranda "do not raise any psychological or emotional issues that would justify a psychological evaluation," as her "thoughts are cogent, well organized and follow logical themes." J.A. 579–580.

A reasonable jury could likewise agree with the Doctor that, "[w]hile a few of the words that Capt. Coleman uses are emotionally charged, such as the word 'mutiny[,'] these terms are not necessarily indicative of any emotional or psychological dysfunction," but rather are "likely indicative of frustration in not getting closure on issues that Capt.

Coleman felt were important to the efficiency of the Department's operations." J.A. 580.[6]

To the extent, then, that the validity of the Department's rationale turns on whether its explanation is credited over that of Coleman's expert, that credibility judgment or "weighing the evidence" is for a jury to make, not a court at summary judgment. *Jones v. Bernanke*, 557 F.3d 670, 681 (D.C. Cir. 2009); *see id.* ("[A]t this stage we refrain from making credibility determinations, weighing the evidence, or drawing inferences from the evidence—these, after all are jury functions, not those of a judge ruling on a motion for summary judgment.") (internal quotation marks omitted); *see also George v. Leavitt*, 407 F.3d 405, 413–414 (D.C. Cir. 2005) (plaintiff proffered sufficient evidence from which a jury could find that the employer's stated reasons for terminating plaintiff were pretextual, not "undisputed"). Given all of those issues of disputed fact, Coleman's claim that the evaluation order was retaliatory survives the Department's motion for summary judgment.[7]

---

[6] Because Dr. Hugonnet's assessment was based on the same set of communications and actions that Lee cited as the impetus for his order in the first place, the dissenting opinion is incorrect to suggest that the timing of the assessment would as a matter of law preclude a jury from crediting it. *See* Dissenting Op. at 10.

[7] Her claim may also survive with respect to any subsequent prohibited personnel actions that can be causally linked to the evaluation order and the protected disclosures that Coleman claims prompted it. The district court rested its holding that these subsequent actions could not be shown to be retaliatory on its conclusion that that order itself was not retaliatory, *see Coleman*, 893 F. Supp. 2d at 105. Having overturned that summary judgment determination, we leave open on remand the question of whether

Finally, Coleman argues on appeal that her April 5th citation and subsequent 24-hour suspension, as well as a June 5th citation for failing to enforce a grooming policy were retaliatory as well.

The April 5th citation, however, predates all of the protected disclosures that Coleman highlights on appeal, and consequently could not have been caused by them. And the suspension followed the Department's determination, after an evidentiary hearing, that Coleman did in fact make a mistake at the fire ground when she failed to provide a basement report. Although Coleman challenges that administrative determination on appeal, the individually focused factual question of whether Coleman actually made a mistake at the fire site is a "wholly different" inquiry "from whether [the Department cited her] because its investigation found that [s]he had." *McCormick*, 752 F.3d at 986. The latter is a question of permissible employer motivation that this court can review; the former is not.

Beyond that, Coleman presented no evidence that Battalion Chief Kane, who presided over the hearing and issued the suspension, had any knowledge of any protected disclosure. Without evidence, circumstantial or otherwise, that "the decision-maker[] responsible for the adverse action had actual knowledge of the protected activity," Coleman has failed to create a disputed fact question about whether the decision was retaliatory. *McFarland v. George Washington University*, 935 A.2d 337, 357 (D.C. 2007); *accord Talavera v. Shah*, 638 F.3d 303, 313 (D.C. Cir. 2011). Coleman thus

---

the Department may be held liable for subsequent adverse personnel decisions stemming from Coleman's refusal to submit to the fitness-for-duty examination.

failed to make out even a *prima facie* case with respect to that incident.[8]

As for the June 5th citation, the district court deemed it justified based on two rationales, neither of which the Department itself proffered. That will not do. The Department, moreover, did not supply on appeal any alternative basis for affirming that decision. We consequently vacate the grant of summary judgment as to the June 5th citation. The reserved question of whether that claim was forfeited by Coleman through her discovery responses remains open on remand. *See Coleman*, 893 F. Supp. 2d at 104.

In closing, we note that the dissenting opinion spills a lot of ink assembling summary judgment arguments that the Department never pressed and on which the district court did not rely. We do not dispute that a reasonable jury could credit the evidence and draw the inferences on which the dissenting opinion relies. Maybe the dissent is even correct that, were we to weigh the evidence ourselves and draw inferences in

---

[8] The D.C. Court of Appeals has subsequently noted (without deciding) that its holding in *McFarland* could be limited if an employee established causation based on a so-called "cat's paw" theory of liability. *See Bryant v. District of Columbia*, 102 A.3d 264, 268 n.3 (D.C. 2014); *see also Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1191–1194 (2011) (recognizing that liability could be found under Title VII where the ultimate decisionmaker was not motivated by discriminatory animus, but a lower-level supervisor was and proximately caused the challenged employment action). Coleman has made no attempt to proceed on such a theory here or otherwise to suggest that *McFarland*'s actual-knowledge requirement is not applicable.

favor of the defendants, the Department might have the better of the argument.

But that is not how summary judgment is supposed to work. This court is duty bound at this procedural juncture "to view the facts in the light most favorable to the nonmoving party," and to draw all reasonable inferences in support of Coleman—not the Department—while holding the Department to its exacting burden of proof and the strategic judgments it chose to make. *Lash v. Lemke*, 786 F.3d 1, 6 (D.C. Cir. 2015) (internal quotation marks omitted); *see also*, *e.g.*, *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014) (per curiam) (vacating court of appeals' judgment for disregarding "the axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor") (internal quotation marks and brackets omitted).

In particular, whether or not the Department *could have* argued that Coleman's history of "conflict, dissension, and disobedience," Dissenting Op. at 10, underlay the referral for a fitness evaluation, it is both telling—and procedurally dispositive—that the Department did not make that argument in any non-conclusory fashion on appeal, and only referenced it in passing before the district court as well. *See* Defs.' Br 38-40; Defs.' Mot. for Summ. J. at 13, 25–28, 36–37, *Coleman v. District of Columbia*, No. 1:09-cv-50 (RCL) (Aug. 8, 2012), ECF No. 131. Thus if, as the dissent suggests, Dr. Hugonnet did not address Coleman's history in detail, then he had company. More to the point, because the court's duty at summary judgment is to afford the plaintiff all reasonable inferences from the record, "[i]t is not" and should not be "enough merely to mention a possible argument in the most skeletal way" in one sentence on the fortieth page of a brief, and then "leav[e] the court"—or the dissenting

opinion—"to do counsel's work." *Bryant v. Gates,* 532 F.3d 888, 898 (D.C. Cir. 2008) (internal quotation marks omitted).

Likewise, while the Department perhaps could have argued that Lee had a mistaken but reasonable and honestly held belief that Coleman's emails and actions warranted the fitness evaluation, *see* Dissenting Op. at 9, it did not do so. Unlike the dissenting opinion, we do not believe it is appropriate for this court to save a summary-judgment movant from the consequences of "its own muddled litigation strategy." *Potter v. District of Columbia*, 558 F.3d 542, 552 (D.C. Cir. 2009) (Williams, J., concurring); *see also George*, 407 F.3d at 415–416 (declining to affirm summary judgment on an essentially identical "theory" that the government "did not rely on * * * before us").[9]

The dissent grounds its contrary conclusion in case law that did not involve the far more exacting clear-and-convincing standard of proof that the defendants bear here. *See* Dissenting Op. at 8; *see also Aka v. Washington Hospital Center*, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (noting employer's burden of production, not persuasion, under federal burden-shifting framework). The dissenting opinion's reliance (at 8) on *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000), is even more baffling, since *Reeves* says only that "abundant and *uncontroverted* independent evidence" may be sufficient to obtain summary judgment

---

[9] The dissenting opinion's worry about the policy implications of the decision also steps out of bounds. Whether the Whistleblower Act should be applied to public safety agencies is a policy call for the legislature. Our duty is to apply the statute as written and to hew to precedent.

when the defendant does not bear any burden of proof at all, *id*. at 148 (emphasis added).[10]

Here, on what the dissenting opinion deems the key question—"whether Lee honestly thought an exam was warranted" because of Coleman's history of dissension and complaints (Dissenting Op. at 11)—the evidence is controverted by (i) the Department's admission that Coleman's communications played a role in the referral, (ii) Coleman's expert, (iii) the testimony of her colleague, and (iv) the thus far uncontroverted fact that the *only* intervening event between Lee's wondering about a referral and his decision to order it was Coleman's protected disclosure on July 23rd. Keeping in mind the Department's exceptional burden under the Whistleblower Act, we hold only that when *all* reasonable inferences in this record are drawn in favor of Coleman, the record does not compel *as a matter of law* the conclusion either (i) that Coleman's protected complaints about fire management did not "tend[] to affect in any way" the Department's decision to refer her for a fitness for duty examination, D.C. Code § 1-615.52(a)(2), or (ii) that the Department *proved* by *clear and convincing evidence* that the decision would have occurred for "legitimate, independent reasons" even if Coleman had not made the protected complaints, *id.* § 1-615.52(b).

---

[10] This case stands in sharp contrast to *Johnson* where the plaintiffs provided "no evidence" that the defendant's proffered rationale was pretextual. *See* 935 A.2d at 1122; *see also Bowyer*, 2015 WL 4079800, at \*5 (summary judgment appropriate where plaintiffs made no effort to show that the asserted reason for adverse action was pretextual).

## III

## Conclusion

A reasonable jury could conclude based on the summary judgment record that one or more of Coleman's individual complaints qualifies as protected under the Whistleblower Act, that Coleman established a *prima facie* case of retaliation as to those complaints, and that the Department failed to rebut that *prima facie* case with clear and convincing evidence of a legitimate, non-retaliatory reason for its actions. Accordingly, we reverse the grant of summary judgment in favor of the Department as to those aspects of Coleman's Whistleblower Act claim, as well as to the June 5th citation. We remand for the determination whether and to what extent the Department may be held liable for subsequent adverse personnel decisions stemming from Coleman's refusal to submit to the fitness-for-duty examination, and for further proceedings consistent with this opinion. We affirm the district court's grant of summary judgment on Coleman's Whistleblower Act claim as it relates to her April 5th citation and May 31st suspension.

*So ordered.*

BROWN, *Circuit Judge*, dissenting: This is an unusual case—one in which the court's interpretation of the Whistleblower Protection Act, D.C. Code §§ 1-615 *et seq.* ("WPA") makes a virtue of insubordination; where the existence of putative protected disclosures means defiance is a complete defense—or at least a justification for a jury trial.

I reluctantly agree with my colleagues that Coleman's self-serving defenses to the discipline initiated by the Fire Department included, among much finger-pointing and disclaiming of responsibility, some complaints that might qualify as protected disclosures under the WPA. I also agree the WPA requires a defendant to meet a stringent standard when retaliation is alleged, and that a district court cannot compensate for inadequacies in the defense's case by drawing its own inferences as to the legitimacy of the employment actions taken. Here, the employer marshalled a mountain of evidence supporting the legitimate, non-retaliatory reasons for its employment decision; but, because defense counsel failed to recognize that Coleman's blame-shifting criticisms might fall within the broad ambit of protected disclosures, the summary judgment motion was not as strong as it might have been. However, as the court notes, the Department did articulate legitimate, non-retaliatory rationales for referring Coleman for a fitness evaluation. *See* Mot. for Summ. J. at 2–16, 26–29, 36–37, Coleman v. District of Columbia, No. 1:09-cv-50 (RCL) (Aug. 8, 2012), ECF No. 131. And the district court considered the Department's reasons. *See* J.A. 113 ("[Coleman's] filings, *as well as [her] other behavior*, gave the defendants legitimate concern about her mental state, and her ability to safely command her company.") (emphasis added). Given Coleman's anemic and largely irrelevant rebuttal, no reasonable jury could have concluded the Department's purpose or motive was retaliatory. The Department's reasons for ordering the fitness evaluation hold up even under the WPA's clear and convincing standard.

To begin at the beginning, Coleman went to work for the D.C. Fire and Emergency Medical Services Department ("FEMS" or "the Department") right out of high school. By December 2007 she was a captain in charge of an engine company.

In March 2008, a devastating fire erupted in a high rise apartment building in Washington's Mount Pleasant neighborhood. Under FEMS Standard Operating Guidelines, the first company to arrive at a fire scene is responsible for checking the building's basement, and Coleman's company was the first to arrive. That fire, one of the largest in the D.C. Fire Department's recent history, was badly managed. The apartment building was totally destroyed and a nearby church was badly damaged. An initial investigation indicated that miscommunications contributed to the bad outcome. Battalion Fire Chief John Lee, who was in charge of the fire scene, radioed Captain Coleman for a "basement report." Coleman told him her company was on the second floor. The basement check, which had been Captain Coleman's initial responsibility, was never completed. Coleman's excuse was that BFC Lee had ordered her to the third floor of the building. Lee acknowledged that he gave the order and did not confirm that the basement check had been completed. Coleman followed his orders with alacrity but did not inform Lee or Command this crucial task had been neglected. It was Coleman's obligation to inform command of her inability to effectively carry out an order. Subsequent analysis of the fire suggested the omission may have fatally undermined the Department's efforts to control the fire since it apparently started in the basement. BFC Lee and Captain Coleman each placed blame at the other's feet; both were charged with a violation of fire protocols. John Lee accepted the proposed discipline and was reprimanded. Coleman refused to accept any responsibility, challenged the decision, and ultimately

received a suspension. Coleman's claim to whistleblower protection arises out of her efforts to escape criticism for the Mount Pleasant debacle.

Coleman instigated a near-obsessive campaign for absolution. This campaign involved a barrage of e-mails to her immediate supervisors and beyond, the circulation of a blog post entitled Vanessa Coleman's Job Crisis Journal, a radio interview, a letter to the mayor and two D.C. councilmembers, an EEO complaint, and finally a refusal to submit to a fitness evaluation she had been ordered to undergo. Coleman's fixation with clearing herself of wrongdoing culminated in the filing of this lawsuit, alleging the request for a fitness evaluation was an act of retaliation by the Department. Not surprisingly, the district court concluded the Department had articulated legitimate, non-retaliatory reasons for its actions. First, the court concluded the Department "reprimanded [Coleman] for making an error at the scene of the fire *because they found she actually made such an error*." J.A. 104 (emphasis in original). Moreover, the court noted once defendants offered a legitimate, non-retaliatory reason for taking action, a plaintiff's inability to show the proffered reasons are mere pretext is fatal. The court held that "[b]y repeating and documenting her long trail of filings and memoranda, [Coleman] has inadvertently provided documentary support for defendant's legitimate reason for taking action against her." J.A. 114.

As the district court noted, once the employer asserts a legitimate, non-discriminatory reason for the challenged action, *see Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008), the court's task is to review all the evidence to determine a single question: whether the evidence "either separately or in combination provides sufficient evidence for a reasonable jury to infer retaliation." *Jones v.*

*Bernanke*, 557 F.3d 670, 679 (D.C. Cir. 2009); *see also Crawford v. District of Columbia*, 891 A.2d 216, 221 n.12 (D.C. 2006) (adopting the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden shifting paradigm for WPA cases). The only reason the *prima facie* case is important here is because defendants, confident that Coleman's self-serving litany of excuses could not be deemed protected disclosures, relied more heavily on the plaintiff's procedural deficiencies than on the Department's abundance of supporting facts.

The confusion is understandable. Ordinarily, a protected disclosure precedes and arguably leads to the adverse employment action and thus the inference of retaliation. Here, in contrast, Captain Coleman was already in the midst of a disciplinary procedure when she raised the disclosures at issue as a defense. She then claimed subsequent employment actions—the ordered fitness evaluation and the termination that resulted from her adamant refusal to follow orders—were retaliatory. But, these actions rise and fall together. If the initial order for a fitness for duty assessment was not retaliatory, the many additional opportunities to comply cannot be faulted.

Assistant Chief Brian Lee's intuition that all might not be well with Coleman was not, as the court contends, cherry picking a few words out of context. Maj. Op. at 23. Paranoia was the leitmotif of Coleman's communications during this period. Coleman purported to "cite" a superior claiming he had "orchestrated a behavior of mutiny." J.A. 272. She referred to a "conspiracy" against her, J.A. 272, and compared herself to a victim of "concealed acts of friendly fire" during "combat," J.A. 249a, 253. She wrote that her superiors were engaged in a "pursuit" to "diabolically cripple [her] professional career," and if quick action were not taken to

correct "such violent, misuse of authority," the "entire [Fire Department] will lie in irreversible peril," J.A. 246, 248. In another communication, Coleman stated: "If a man is facing execution, at a certain time and certain place, it is his civic right to be explained the charge for which he is being executed for. It's too late to remit explanation after the man is dead—having already been executed." J.A. 249a. Coleman sometimes made these communications in a manic fashion; she wrote, for example, six memoranda to the Fire Chief in a single day. And Assistant Chief Brian Lee had other indications that Coleman's mental state might be deteriorating. While talking to Coleman, Lee noticed that she raised the same issues repeatedly and sounded "frantic," "disjointed," and even a "little incoherent." J.A. 893, 915–16. Given these curious communications, any supervisor worth their salt would question whether an employee was fit for duty.

The Department also offered other reasons for ordering the evaluation. In his affidavit, Brian Lee cited as the most significant sign of erratic behavior that "Coleman's continually disregarded orders and the chain of command, [and] repeatedly placed her subordinates and superiors on numerous charges . . . ." J.A. 457. Indeed, he asked for "immediate help" in ordering a fitness for duty evaluation precisely because Coleman had violated "the chain of command" and her reports had become "more alarming." J.A. 288. Significantly, Lee asked for assistance in ordering the evaluation a full week before Coleman's July 23rd protected disclosure—robust proof that Lee did not order the evaluation for retaliatory purposes.

The different attitude displayed by Lee and Coleman toward firehouse culture is illuminating. Lee continually stressed the importance of obeying orders. He described the

Department as a "paramilitary organization" and stressed the impropriety of willfully disobeying orders. Because being willing to follow orders is part of the contract to which every member of a fire department agrees when they accept the job, he found Coleman's objection that she had not consented to the fitness exam incomprehensible. In an organization where following orders is essential to function, following orders cannot be inconsistent with consent. Coleman, in contrast, refused to follow orders with which she disagreed. In 2006 Coleman alleged she was the victim of gender discrimination. After an exhaustive investigation, no probable cause was found to support her complaint, but a review of previous complaints revealed "that every time Captain Coleman was subject to personal discipline or something she did not like, she alleged discrimination." J.A. 459, Aff. of Detria Liles Hutchinson. Soon after Coleman was promoted to captain she was informed that several discrimination complaints had been made against her. Coleman refused to meet with the head of FEMS's Women's Advisory Committee; when the manager of the EEO Program, Detria Hutchinson, went to the Firehouse to talk with her, Coleman refused to meet with her; and when that refusal led to an order to attend an EEO for Managers class Coleman refused to comply, first claiming she had a flat tire and then refusing to go because she claimed the class was "punitive." Coleman subsequently filed charges against Hutchinson for recommending she attend the EEO for Managers class. Hutchinson concluded: "Captain Coleman believes . . . she is above such training." J.A. 462.

The only time Coleman insisted that orders must be followed is when she believed that requirement excused her actions at the Mount Pleasant fire. The Trial Board's consideration of the charges of the insubordination that resulted from refusing the fitness exam confirmed this pattern. After a comprehensive review of Captain Coleman's

personnel record, the Board noted a "particularly alarming" finding: Captain Coleman frequently had conflicts with superior officers and subordinates throughout her career.

Coleman's repeated refusals to submit to a fitness evaluation—a clear case of insubordination in a department as hierarchical as FEMS—provided another sufficient alternative explanation for her termination. *See Johnson v. District of Columbia*, 935 A.2d 1113, 1118 (D.C. 2007) ("Even assuming that the appellants had proffered [a *prima facie* case], the summary judgment motion would have been meritorious nonetheless if [plaintiff] could not counter the [defendant's] explanation that [plaintiff] would have been suspended anyway, for an unrelated, legitimate reason."). Lee's explanation is all the more persuasive since Coleman identifies no specific disclosure for which the Department sought to retaliate. Finally, Lee explained that if Coleman was found fit for duty after the evaluation, she would be returned "to commanding a frontline company," suggesting the evaluation was ordered for safety reasons, not as retaliation for any protected disclosure. J.A. 457–58.

In the face of overwhelming proof that Lee ordered a fitness evaluation to assess whether Coleman was a danger to herself, the public, or other firefighters, the court claims Coleman's meager cache of contrary evidence rebuts the Department's proffered rationale. A psychologist with significant experience in conducting fitness-for-duty examinations reviewed the communications at issue and concluded that there was no "logical, psychological or medical basis" for ordering the evaluation. J.A. 579. The court claims that, to the extent the "validity of the Department's rationale turns on whether its explanation is credited over that of Coleman's expert," such a "credibility

judgment is for a jury to make, not a court at summary judgement." Maj. Op. at 24.

That is not the law of this circuit. What is occurring is not simply a credibility determination; it is, just as with every request for summary judgment, consideration of the entire record in deciding whether a reasonable jury could conclude that the plaintiff suffered retaliation. *See Jones*, 557 F.3d at 679 (a court must consider whether the evidence "either separately or in combination provides sufficient evidence for a reasonable jury to infer retaliation"). We have previously noted that not every plaintiff "who creates a genuine issue of material fact" as to pretext "will *always* be deemed to have presented enough evidence to survive summary judgment." *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1290 (D.C. Cir. 1998) (emphasis in original). We instead made clear that a "court must consider all the evidence in its full context in deciding whether the plaintiff has met [her] burden of showing that a reasonable jury could conclude that [s]he had suffered discrimination and accordingly summary judgment is inappropriate." *Id*. Indeed, the Supreme Court has expressly held that an "employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision. The court dismisses *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133 (2000), but if the same framework governs discrimination and retaliation cases, then abundant, uncontroverted, independent evidence of an alternative, non-retaliatory explanation for the employer's action should be dispositive no matter what evidentiary standard applies. If, as the court here seems to hold, overcoming summary judgment merely required an opposing evaluation from a plaintiff's expert—thus creating only a weak issue of fact on whether the employer's reason was untrue—then summary judgment could never serve the role of weeding out cases with

insufficient proof. *See Vatel v. Alliance of Auto. Mfrs.*, 627 F.3d 1245, 1249 (D.C. Cir. 2011) ("Vatel's submission thus boils down to the proposition that discrimination plaintiffs should receive jury trials as a matter of course, on the theory that the question whether the defendant was motivated by racial or gender bias is always a question of fact for a jury. But that is not the way the law has developed.").

More importantly, even if a jury were to credit Coleman's expert, it would be insufficient to rebut the reasonability of Lee's belief that if Coleman's general disobedience to the chain of command, augmented by the tone and volume of her communications, was left unaddressed, it might endanger the public safety. *See Brady*, 520 F.3d at 496 ("The question is not whether the underlying . . . incident occurred; rather, the issue is whether *the employer honestly and reasonably believed* that the underlying . . . incident occurred.") (emphasis in original); *George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005) ("[A]n employer's action may be justified by a reasonable belief in the validity of the reason given even though that reason may turn out to be false."); *Fischbach v. District of Columbia Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) ("Once the employer has articulated a non-discriminatory explanation for its action . . . the issue is not the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers."). In a close case, a plaintiff's expert might create a dispute sufficient to preclude summary judgment. But here the communications on their face created great cause for concern, as did Coleman's repeated refusal to follow the chain of command; the supervisor began planning for an evaluation *before* the protected disclosure occurred; and the supervisor explained that if Coleman passed the fitness-for-duty exam, she would return to active service. Thus, only through the other side of the looking glass has Coleman's evidence

rebutted the Department's "proffered rationale." Maj. Op. at 22.

To say Coleman's rebuttal is weak overstates the case. Although Coleman's expert indicated he reviewed numerous affidavits and the testimony before the Fire Department Trial Board, his opinion focuses only on the import of Captain Coleman's comments and neglects entirely the history of conflict, dissension, and disobedience detailed in those documents.[1] More importantly, how can an expert's after-the-fact review of Coleman's written communications rebut Lee's contemporaneous observations? Indeed, Dr. Hugonnet, who was hired by Coleman, performed his assessment a year after Brian Lee requested the evaluation. And what relevance does the testimony of Coleman's subordinates have? *See* Maj. Op. at 30. Neither was her superior or exercised supervisory

---

[1] I agree with the court that the Department's lawyering could have been better. But the Department did raise Coleman's lengthy history of conflict before the district court. *See* Mot. for Summ. J. at 2–16, 26–29, 36–37, Coleman v. District of Columbia, No. 1:09-cv-50 (RCL) (Aug. 8, 2012), ECF No. 131. And it did so again on appeal. *See* Defs. Br. at 40 (raising "legitimate grounds for ordering the evaluation," which included that Ms. Coleman "was not heeding direction from Assistant Chief Brian Lee or other superiors, refused to take a required EEO training, and repeatedly attempted to cite her superiors, as well as her subordinates, for discipline. (*See supra* at 8–13)"); *id* at 8–13 (describing in detail Coleman's history of conflict, dissension, and disobedience). Furthermore, the record presents this history from many disparate perspectives—all confirming Brian Lee's explanations for ordering the fitness evaluation. J.A. 288, 306. The court ignores this evidence because counsel's argument is too skeletal. *But see Reeves*, 530 U.S. at 148 ("[A]n employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision[ ].").

authority, and there is no indication either one was privy to Coleman's conflict-riddled employment history or the numerous disturbing communications between Coleman and her superiors. Thus, Coleman's evidence is of extremely limited relevance, if any. *See DeJarnette v. Corning Inc*., 133 F.3d 293, 299 (4th Cir. 1998). Moreover, these offers of proof attempt to answer the wrong question. That an expert, or Coleman's coworkers, did not believe Coleman's conduct justified an evaluation does not answer the question of whether Lee honestly thought an exam was warranted. It is well settled that it is the perception of the decision maker that is relevant. *See Vatel*, 627 F.3d at 1247. Here, Lee's assessment was entirely consistent with the record. Coleman was an unrepentant outlaw, who had made a number of disjointed communications, failed to follow any orders or directives that did not suit her, and apparently believed all her co-workers were out to get her. These facts are not disputed.[2] As we have said many times, "[i]f the employer's stated belief about the underlying facts is reasonable in light of the evidence . . . there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts." *Brady*, 520 F.3d at 495; *see also Carney v. American University*, 151 F.3d 1090, 1094 (D.C. Cir. 1998) (holding that plaintiff's "factual proffer requires too much speculation to create a genuine issue of fact about [defendant's] motivations").

In addition, Lee's assessment was consistent with that of Dr. Smith-Jeffries, the doctor assigned by the Fire Department to evaluate Coleman. After Dr. Smith-Jeffries received the

---

[2] Contrary to what the court claims, Lee's justification for ordering the evaluation based on Coleman's "history of dissension" was never controverted by Coleman's expert, who addressed only Coleman's histrionic comments, or by her colleagues' positive views of her work performance.

request for an examination, the doctor phoned Brian Lee and considered his rationale. Based on the information provided, Dr. Smith-Jeffries had questions about Coleman's "competency" and "whether there might be some paranoia." J.A. 513. The questions were troubling enough that, although Dr. Smith-Jeffries did not have sufficient information to conclude Coleman was unfit, she concluded a "full assessment" was warranted. J.A. 513–14. Dr. Hugonnet dismisses this contrary evidence and the court ignores it, but it is the finishing blow to any claim that a reasonable jury could find the testimony of Coleman's expert or coworkers adequately rebuts the Department's legitimate reason for ordering the fitness evaluation. *See* Maj. Op. at 25. Coleman should not be able to parlay her insubordinate refusal to cooperate into proof the Department acted with bad motives.

In the end, the only inference of retaliation here is the temporal proximity between the July 23rd protected disclosure and Lee's ordering of the fitness-for-duty exam on July 25th. But "an inference of retaliation cannot rest solely on temporal proximity (even if it is established) where the opportunity for retaliation conflicts with the opponent's explicit evidence of an innocent explanation of the event." *Freeman v. District of Columbia*, 60 A.3d 1131, 1145 (D.C. 2012). Lee's innocent explanation for ordering the exam can be found in an email he sent a week before Coleman made the protected disclosure. Lee stated that he needed "some immediate help" in ordering an evaluation because Coleman had broken the "chain of command" and her reports were "becoming more alarming." J.A. 288. Coleman did nothing to rebut this explanation. No reasonable jury could believe the protected disclosure was a "contributing factor" in Lee ordering Coleman to undergo an evaluation. *Crawford*, 891 A.2d at 219.

Had the court's result occurred in another context it would be cause enough for alarm given the many ways it runs counter to our precedents. That it occurred in the context of a fire department makes it doubly distressing. The standard the court adopts will lead supervisors in police and fire departments to hesitate in ordering evaluations for employees working in dangerous jobs (where evaluations are needed most) if the employee claims to have made a protected disclosure. Courts ordinarily defer to supervisors in workplaces where employees must follow orders and respond to stressful situations involving public safety. *E.g. Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 565 (7th Cir. 2009) (fire department); *Conroy v. New York State Dep't of Corr. Servs.*, 333 F.3d 88, 99–100 (2d Cir. 2003) (correctional facility); *Brownfield v. City of Yakima*, 612 F.3d 1140, 1146–47 (9th Cir. 2010) (police department); *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007) (juvenile unit of police department). "In these 'public safety' workplaces, an employer may be justified in requesting a psychological exam on slighter evidence than in other types of workplaces because employees are in positions where they can do tremendous harm if they act irrationally, and thus they pose a greater threat to themselves and others." *Kroll v. White Lake Ambulance Auth.*, 763 F.3d 619, 626 (6th Cir. 2014); *see also Watson v. City of Miami Beach*, 177 F.3d 932, 935 (11th Cir. 1999) ("In any case where a police department reasonably perceives an officer to be even mildly paranoid, hostile, or oppositional, a fitness for duty examination is job related and consistent with business necessity."). If, on this record, the court finds the clear and convincing standard is still not met, the real consequence is that every evaluation order following any purportedly protected disclosure will precipitate a jury trial. Such a result is not only contrary to our precedent but to the Supreme Court's as well. *See Reeves*, 530 U.S. at 148 ("[A]n employer would be entitled to judgment as a matter of

law . . . if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.").

The great irony of today's decision is that the Whistleblower Protection Act was designed to protect those who might "risk their own personal job security for the benefit of the public." *Williams v. District of Columbia*, 9 A.3d 484, 490 (D.C. 2010). Our decision instead shields Ms. Coleman's insubordinate conduct and demands a jury trial for a completely understandable and reasonable order requiring Coleman to undergo an evaluation to see whether she remained fit for duty—an order which itself was likely intended to protect the public safety. I respectfully dissent.